## BENNETT v. SALISBURY.

(Circuit Court of Appeals, Second Circuit. February 23, 1897.)

**1. LIBEL—FALSE NEWSPAPER PUBLICATION—MALICE—RECKLESS INDIFFERENCE.**

A newspaper proprietor, absent in Europe, prescribed for his employés a rule that communications of a personal nature sent by unknown correspondents must be verified on investigation by an accredited correspondent, and, when so verified, might be published. *Held*, that where a scandalous story, so received, verified, and published, was utterly untrue, the court, in an action against such proprietor, properly left it to the jury to determine whether the rule evinced such wanton disregard of others' rights, and such reckless indifference to consequences, as to be equivalent to malice, which would authorize the infliction of punitive damages.

**2. SAME—ADMISSIBILITY OF EVIDENCE.**

In such case, testimony of the city editor as to his belief in the thoroughness of the investigation was properly stricken out, as his good faith or malice was not in issue, and the question of punitive damages turned entirely on the malice of the defendant.

**3. SAME—INSTRUCTIONS.**

Where the publication contained utterly false charges of unchaste and scandalous conduct, the court told the jury it was quite likely they would consider it as an atrocious libel, of the character which, in remoter regions, where respect for law does not prevail to the same extent, is frequently punished by an appeal to the horsewhip or shotgun. *Held*, that this was not error, as, in connection with the whole charge, it was not of an inflammatory character, and amounted to no more than a statement that plaintiff was rather to be commended than prejudiced by appealing to the courts for redress.

**4. SAME—EVIDENCE OF SPECIAL DAMAGE.**

Where punitive damages only are sought, and no evidence of special damages is given, evidence by defendant tending to show absence of special damages may be excluded as immaterial.

78 F.—49

**5. SAME—EVIDENCE—JUDGMENTS AGAINST OTHER NEWSPAPERS.**

Evidence that plaintiff has recovered a judgment against another newspaper for publishing the same libel is inadmissible.

Appeal from the Circuit Court of the United States for the Southern District of New York.

John A. Taylor, for plaintiff.

Joseph H. Choate, for defendant.

Before WALLACE and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge. Everett E. Salisbury, the defendant in error, brought an action in the circuit court for the Southern district of New York against James Gordon Bennett, the publisher and proprietor of the New York Herald, to recover damages for a libel which was published in that newspaper on November 28, 1892, and recovered a verdict for $5,000, whereupon the present writ of error was brought by the defendant in the trial court.

The libel, after the headlines: "Wrecked Two Families. Bertha Kinney's Confession Made Her Mother Insane and Drove Her Father to Resign His Pastorate,"—proceeds as follows:

"Plainfield, Conn., November 27, 1892. The facts have come out to-day in a scandal of the most painful character in the flourishing factory village of Moosup, near this town. The two families involved are the most prominent and influential in the village, and one of them is practically destroyed, the daughter being disgraced, the mother made insane, and the father, a preacher, so overwhelmed with shame and sorrow that he has retired from the ministry. The ruin was caused by the relations between E. E. Salisbury, the wealthiest man in the village, who has a beautiful home and an interesting family, and Miss Bertha Kinney, the daughter of the Rev. G. W. Kinney, pastor of the Baptist Church."

The libel, after giving a sensational story in regard to the discovery of Miss Kinney's condition, the almost hopeless insanity of her mother in consequence, and of the resignation as pastor of "the heart-broken father," said:

"What will be the result of the exposure in the Salisbury family remains to be seen, but Mr. Salisbury stands deeply disgraced in the eyes of all the people of the town in which he had long maintained an irreproachable character."

On the night of November 26th this article was sent by telegraph to the Herald office, and was signed by an unknown person. The employé who acted at the time as night city editor telegraphed the substance of the story to the "accredited" or known correspondent of the Herald in Plainfield, asked him to investigate it, and reply at once whether it was true or false. Moosup is a manufacturing village of 2,500 or 3,000 inhabitants, in the town of Plainfield. This dispatch came within what was called the "city department" of the Herald, which included a radius of about 100 miles, except Philadelphia, from New York. In this department the newspaper had numerous "accredited" agents or correspondents. A witness, who had been connected with the Herald, said: "It would be impossible to tell the number. At every little place they had a correspondent." Reply was received from the regular correspondent about 11 o'clock in the evening of November 27th that the account was correct, whereupon it was published. The entire story, in all

its incidents, turned out to be baseless, and on January 16, 1893, the Herald published a retraction, in which it said that it had made a thorough investigation, and, in substance, that no ground for allegations or suspicions against either of the parties ever existed, and that it had been imposed upon by its news correspondent, who had ceased to have any connection with the Herald. Upon the trial no evidence of special damage was introduced by the plaintiff, and the falsity of the libel was admitted by the defendant. At the time of the publication the defendant was in Paris, and it was apparently conceded that he had no personal ill will against the plaintiff, and had probably never heard of him.

The important question which arises upon the bill of exceptions is in regard to the charge of the trial judge upon the subject of punitive damages. It was testified that the defendant's rule was that the employés should never take anything that should be sent to them by anybody who was not regularly in their employ, and should not print such communications unless they could be verified. Another witness said that the rule was that, when matter of a suspicious nature reached the office, it was not, under any circumstances, to be published, unless each and every statement contained in it was fully verified on investigation by accredited correspondents, or in some other way. The court, after charging the jury upon the question of compensatory damages, charged that the plaintiff was not entitled to punitive damages on account of personal malice or personal ill will on the part of the defendant, and that:

"The only theory upon which it is claimed that exemplary or vindictive damages should be given in this case is upon the theory of reckless indifference to the rights of others. The rule has been laid down by the courts that, even where no actual malice is shown, exemplary damages may be given when there is proved such wanton disregard or such reckless indifference to the rights of others as is equivalent to the intentional violation of such rights. There are cases which have held that a jury was warranted in finding such reckless indifference where a newspaper published libelous statements with regard to an individual without making the slightest effort to investigate into their truth or falsity. Now, the situation here is different from the situation in those cases, because you have evidence here of the employés of the defendant as to the rules of the office. The principal, Mr. Bennett, has prescribed certain rules for the guidance of his subordinates, and for the negligence of his subordinates he is responsible, whether they obey the rules or not. For a malicious act on the part of a subordinate the principal is not responsible, unless he himself has been in fault; that is, in the sufficiency of the rule which he has prescribed. The rule in force in the Herald office at that time was that, where communications libelous in character were received from some one unknown to the paper, they were not to be published until the paper had sent to its accredited representative in the place where the notice came from, and had been informed by him that the statement was accurate."

After stating the arguments which the plaintiff had suggested against the sufficiency of the rule, the judge further charged:

"Bearing those rules in mind, you will determine whether, in publishing this article in the way in which it was published,—that is, hanging it up for twenty-four hours until the accredited agent could be communicated with, and not publishing it until he had vouched for the accuracy of the article,—you are to determine, in the first place, whether or not that rule allowed publications to be made with such wanton disregard of another's rights, and such reckless indifference of consequences, as would be the equivalent of malice. If you reach that

conclusion, you may add compensatory or vindictive damages to the amount which you will find the plaintiff entitled to for injury to his feelings, and for the besmirchment of his reputation. But, unless you do reach the conclusion that the methods adopted in the Herald office under the direction of Mr. Bennett himself, as his personal regulation of the machinery under his control, were so devised that they may fairly be said to be recklessly indifferent to the rights of others, you are not entitled to add anything for exemplary damages to the amount of your verdict."

The defendant excepted to so much of the charge as permitted the jury, under any circumstances of the case, to allow exemplary damages, and to that part of the charge which permitted the allowance of such damages if they found that the rule of the defendant allowed publication to be made with such reckless disregard of others' rights as to amount to malice. The subject of the care that shall be demanded from the large daily newspapers of the country in the investigation of the charges of misconduct or of crime which they publish in regard to persons who are comparatively unknown beyond the communities in which they live, has been, of late, frequently before judges and juries. It has become the course of business of newspapers of this class to receive announcements of this character from news bureaus and from numerous special correspondents who are scattered over the country, and it has been the custom of some daily journals to rely upon the good faith and accuracy of these correspondents, and to publish, in substance, whatever they sent over their own signatures, without further investigation into its truthfulness, and, in an action for libel, when the falsehood of the publication was manifest, to attempt to ward off the charge of recklessness by saying that the information was received and was published in the usual course of business. Neither judges nor juries have been satisfied with the sufficiency of this kind of care. It is so insufficient as to be justly regarded as an absence of care, and as recklessness with respect to the rights and reputations of strangers to the publisher. The excuse was itself regarded as indicative of a careless indifference to and ignorance of the obligations of an owner to use his property so as not to injure others.

This case presents a different state of facts and a different defense upon the subject of punitive damages. The defendant was an absentee, and, in addition to the fact that he could have no personal ill will against a plaintiff of whom he had never heard, he had no personal oversight over the conduct of his agents, and could not be visited with punitory damages for recklessness which he had neither known nor permitted nor countenanced. Thus, Mr. Justice Gray, in Railway Co. v. Prentice, 147 U. S. 101, 13 Sup. Ct. 261, in discussing the law relating to punitive damages against a principal for the unauthorized tort of his agent, says: "Though the principal is liable to make compensation for a libel published or a malicious prosecution instituted by his agent, he is not liable to be punished by exemplary damages for an intent in which he did not participate." The defendant, therefore, for the purpose of showing that he did not give his employés license to publish libelous articles without investigation, and could not, therefore, be

considered as participating in their conduct if it was malicious, gave evidence of the rules which have been stated. The trial judge was, therefore, called upon to look at the rule, and see whether, if carried out, it shut the door against recklessness, or if it was simply a course of conduct which was recklessness in itself. He was properly of the opinion that an absent owner of a newspaper, who had left the reputations of people to protection by this rule only, could not be said to be, as matter of law, freed from liability to punitory damages, and that the question was one of fact for the jury. He therefore instructed the jury in the language which has been quoted.

The rule was, **in substance**, that communications of a personal nature, which were sent by unknown correspondents, must be verified on investigation by an accredited correspondent, and, when thus verified, might be published; and the question which was submitted was whether, upon its face, and in view of the known hazards which attend the imprimatur of an accredited correspondent, it was not merely inadequate, but was so devised as to show that the owner of the newspaper was recklessly indifferent to the rights of others. Experience has shown it to be a fact that the rule of implicitly trusting a newspaper correspondent is a dangerous one, and that of all slanders those in regard to chastity require prudent investigation, lest the character of innocent persons should suffer a lifelong injury. The rule in question turned over a suspicious story from an unknown author to the regular correspondent. The rule is silent in regard to the character of the investigation, the character of the man who is to make it, the caution, the prudence, the thoroughness with which it must be conducted, the amount of proof which must be required, or the extent of the report which must be made. The story which was received at the office of the Herald, if it was true, wrecked, and if it was not true, must injure, the happiness of two families, and was of such a character as to require especial caution before publication. The jury probably found that the rule was inadequate to meet the imperative demands for prudence and caution which an investigation of the truth of such a narrative required. If such a rule is to protect from punitive damages the absent or nonresident or resident owners of newspapers who intrust the management of their large property and business to subordinate agents, the principle of law which makes careless indifference to an injury which may happen to others equivalent to malice can be easily avoided. It is probably true that the requirement of a more stringent rule and more searching habits and practice of investigation and of more self-denial in respect to the publication of libelous matter would compel a marked diminution of that style of news, but such a result would not be a cause for anxiety.

A sentence in the charge of the judge is excepted to in which he told the jury that it was quite likely that they would consider that it was an atrocious libel, of the character which in remoter sections of this country, where respect for the law does not prevail to the extent that it does here, is frequently punished by an ap-

peal to the horsewhip or the shotgun. That it was an atrocious libel was manifest, and was not denied. The context shows that the remaining part of the sentence was for the purpose of suggesting to the jury that an appeal to the courts of the country for reparation was not to be regarded as improper or unmanly. The remark, read in connection with the whole charge, was not of an inflammatory character. It was but the statement of a fact within common knowledge, and in substance amounted to no more than telling the jury that the plaintiff should rather be commended than prejudiced by choosing a judicial tribunal for redress.

Questions were asked of the night city editor, who was in charge of the office when the communication was referred to the regular correspondent, as to his belief in the thoroughness of the investigation. The answers were stricken out upon motion, to which the defendant excepted. The good faith or the malice of the city editor was not in issue, for the question in regard to punitory damages turned entirely upon the malice in fact, if any there was, of the absent defendant.

The plaintiff was asked by the defendant if he knew of any one in Moosup who believed the story, and if he had lost his status in society or in the church, and if he had lost business in Moosup in consequence of the libel, which questions, upon objection by the plaintiff as immaterial, were ruled out. No special damage was attempted to be proved. It was not claimed upon the trial that he had sustained such damage, and the jury were consequently informed in the charge that there was no evidence of any pecuniary loss sustained. Inasmuch as the plaintiff's testimony was silent in regard to special damage, the attempt to prove its absence became immaterial.

An objection was made to the defendant's attempt to prove that the plaintiff had recovered judgment against another newspaper for the publication of the same libel, which objection was sustained. The same question, in substance, was considered by this court in Printing Ass'n v. Smith, 14 U. S. App. 173, 5 C. C. A. 91, and 55 Fed. 240, and was properly regarded as immaterial. The judgment of the circuit court is affirmed, with costs.