TIMES PUB. CO. v. CARLISLE. JOURNAL CO. v. SAME. WORLD PUB. CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. May 8, 1899.)

Nos. 1,137–1,139.

1. LIBEL—ACTIONS—DAMAGES.
    A good name is more estimable than tangible property, and as valuable, and the law gives corresponding redress for its injury.

2. SAME—EVIDENCE—PRESUMPTION FROM GOOD REPUTATION OF PLAINTIFF.
    Every man is presumed to be innocent of crime until he is proved to be guilty; but there is a stronger presumption that a man of good reputation is not guilty of a criminal charge, and he who attacks the reputation of such a man cannot escape the effect of this presumption.

3. SAME—NECESSITY OF PROVING ACTUAL MALICE.
    The unprivileged publication of matter that is false and libelous per se warrants the recovery of compensatory damages, without allegation or proof of malice in its ordinary acceptation; that is to say, ill will, bad motive, hatred, or intent to injure.

**4. SAME—IMPLIED MALICE.**

Malice, in its legal sense,—that is to say, "an act done wrongfully, without legal justification or excuse,"—is conclusively implied from such a publication.

**5. SAME—UNPRIVILEGED PUBLICATION—JUSTIFICATION.**

The fact that the information from which such a publication was made was derived from another, who made or repeated the charge it contained, and that the name of the informant was stated in the libel, is no justification for its publication.

**6. SAME—EXEMPLARY DAMAGES.**

Exemplary damages may be allowed by the jury, in an action of libel, when the publication was made with ill will, or a willful intent to injure the party libeled, and the matter published was false, libelous, and unprivileged.

**7. SAME.**

A violation of the rights and feelings of the victim of a libel, which is caused by a reckless disregard of them, is the legal equivalent of an intentional violation of them.

**8. SAME.**

Exemplary damages may be allowed by a jury, in an action of libel, when the publication has been made with a reckless disregard of the rights of the person libeled, although it was not inspired by ill will, spite, or intent to injure him.

**9. SAME—QUESTIONS FOR JURY.**

In an action of libel, it is ordinarily a question for the jury, in view of all the facts and circumstances of the case, whether or not exemplary damages should be allowed; and the amount of such damages is exclusively within their province.

**10. FEDERAL COURTS—FOLLOWING STATE PRACTICE.**

The federal courts in Missouri are not required to follow the statute of that state (Laws 1895, p. 168), which requires juries, in cases in which exemplary damages are allowed, to assess such damages separately.[1]

**11. LIBEL—LIABILITY OF CORPORATION.**

A corporation is liable for exemplary damages for acts done in the course of its business, by its agents, while acting within the scope of their authority and duty, to the same extent as an individual; and a corporation publishing a newspaper may be liable for such damages for circulating a libel therein.

**12. SAME—PLEADING—MATTER IN MITIGATION.**

Under the Code matter in mitigation of damages for the publication of a libel must be pleaded before it can be proved.

In Error to the Circuit Court of the United States for the Western District of Missouri.

These were three actions for libel. The defendant in error, Harold Carlisle, was a merchant, living with his wife, in Kansas City, in the state of Missouri, where he had resided for more than two years, on February 20, 1897. He was 44 years old, and had a good reputation for honesty and integrity. He was engaged with one Peters, under the firm name of Carlisle & Peters, in trade in gents' furnishing goods, at 818 Main street, in Kansas City. He was born in England, and came to this country in 1879. He had been engaged for many years in the business of raising, buying, and selling cattle in New Mexico and Kansas. From 1884 until 1893 he was the manager of a cattle company, which had been incorporated in England, and which had a ranch, and sometimes as many as 20,000 head of cattle, in the southwestern corner of Utah and in the northwestern corner of New Mexico. In 1893 that company closed out its stock, and Carlisle and one Gordon, who then became his partner in this business,

---

[1] For conformity of practice in federal to that of state courts, see note to O'Connell v. Reed, 5 C. C. A. 594, note to Griffin v. Wheel Co., 9 C. C. A. 548, and note to Insurance Co. v. Hall, 27 C. C. A. 392.

occupied the ranch, and conducted the business of buying young cattle, shipping them east, and selling them. Gordon occupied the ranch, and bought, cared for, and drove the cattle, while Carlisle lived in Kansas City, met the herds at Dallas, in the state of Colorado, shipped, and sold them. In June, 1896, Gordon drove about 700 of the cattle of this firm into Dallas, Colo., where Carlisle met him, and shipped them. At this time one Mostyn appeared at Dallas, and claimed that a part of a bunch of 50 cattle, which Gordon had bought from one White, had been stolen by White, and thereupon White was arrested. He was subsequently tried and convicted for the theft. When this claim was made, Gordon produced his bill of sale from White, and Carlisle. remarked that, if there was anything in the bunch that had been stolen, he did not want it, and thereupon separated the cattle purchased from White from the other cattle owned by the firm, and turned them over to Mostyn and a proper inspector for the benefit of their owners. On February 20, 1897, John D. Reeder, the sheriff of Mesa county, Colo., appeared in Kansas City with an affidavit of one Chipman, an information signed by the district attorney of Mesa county, a warrant of arrest, an affidavit of the assistant district attorney of Mesa county for a requisition, a proper requisition on the governor of Missouri for Carlisle, and an order for his arrest and delivery to Reeder on the false charge, which was set forth in these requisition papers, of having in his possession, on June 4, 1896, eight head of cattle which he knew had been stolen by Ed. Young and E. Frank White, and which he intended to appropriate to his own use. On these papers Carlisle was arrested. He declared to all who asked him that he was innocent of the charge, accompanied the sheriff to Colorado, and the district attorney of Mesa county entered a nolle prosequi on the charge against him.

On the evening of the day of his arrest the plaintiff in error the World Publishing Company printed and circulated in the Kansas City World an article which gave an account of the arrest of Carlisle, and of the charge upon which he was arrested, and which contained, among other things, these words in addition: "Sheriff Reeder arrived here from Colorado Saturday morning. He said that for months he had been searching for evidence against Carlisle, who was formerly in the cattle business at Salt Lake City and who is alleged to have been operating with a gang of cattle thieves for money. * * * For a long time cattle thieves have been driving cattle off the lonely ranges in Northern Colorado. The authorities discovered that White drove cattle off the Utah Cattle Company's range in Mesa county and shipped eight head to Dallas, Colo., where they [——] received by Carlisle. Carlisle, in turn, shipped the cattle to Denver, where they were recovered by Sheriff Reeder before a sale was effected. This was last June. Before this the Mesa county sheriff had recovered two shipments of stolen cattle,—one of 20, and one of 40, head." On March 12, 1897, Carlisle sued the World Company for publishing the statements which we have quoted, and prayed for judgment for $20,000 actual damages and $5,000 punitive damages. In its answer to the petition of Carlisle the World Company set out the entire article which contained these quotations, the existence of the requisition papers, and the proceedings which they evidenced, and pleaded that White and Young stole 40 cattle, and delivered them to Gordon, who held them until they were identified as stolen cattle, and taken from the drove of Carlisle and Gordon by the sheriff, and that White and Young had been arrested, and White had been convicted of stealing the cattle. It also pleaded that Reeder, the sheriff, whom it believed, and from whose official position and appearance it was justified in believing, to be reliable and trustworthy, stated, in the presence of its reporter and others, substantially all that the article contained about the defendant in error before it made the publication, and that it published the statements in it without any malicious intent, and without any desire or intent to injure Carlisle.

On the morning of February 21, 1897, the plaintiff in error the Journal Company published in the Kansas City Journal an account of Carlisle's arrest, and of the charge upon which his arrest was made, and, among other things, these words in addition: "Sheriff Reeder arrived in Kansas City yesterday. He claims he has been searching for evidence against Carlisle for six months, and that Carlisle has been associated with a gang of cattle thieves, which has operated to some extent in Utah, stealing about 60 head of cattle. * * * For some time past cattle have been driven off the Utah Company's range in Mesa

county, Colo. Sheriff Reeder learned that Frank White had driven 18 head of cattle off the range, and shipped them to Dallas, Colo., where it is claimed Carlisle received them, and shipped them to Denver. Sheriff Reeder recovered the cattle before a sale had been effected, however. Sheriff Reeder claims to have recovered two shipments of stolen cattle before this,—one of 40 head, and one of 60 head. He claims Carlisle made both shipments." The defendant in error thereupon sued the Journal Company for publishing the statements we have quoted, and that company answered in the same way that the World Company did.

On the same morning, the plaintiff in error the Times Publishing Company printed and circulated in the Kansas City Times an account of the arrest of Carlisle, and of the charge upon which it was made, and, among other things, these words in addition: "The police of this city and John D. Reeder, sheriff of Mason county, Colo., allege that he has been at the head of an organized gang of cattle thieves, that have run off a great deal of stock from Colorado cattle ranges. * * * It is claimed by Sheriff Reeder that Carlisle, who, together with a man by the name of Gordon, is interested in a cattle ranch at Dallas, Colo., purchased 60 head of cattle 18 months ago, and 8 head of cattle last June, which were stolen from the Utah Cattle Company." Thereupon Carlisle brought an action against the Times Company for publishing the statements quoted, and that company answered in the same way that the Journal Company did.

On the motion of the plaintiffs in error, the three cases thus commenced were consolidated and tried together. Carlisle did not claim any damages in his petitions, or on the trial of these cases, for the publication of the fact that he was charged in the requisition papers with, and was arrested for, having eight head of stolen cattle in his possession, which he knew were stolen. His claim was for the publication of the charges contained in the statements we have quoted, and his allegation was that their publication was false and libelous. The gravamen of these charges, stated in different language, was that Carlisle had operated with, or been associated with, or was the head of, a gang of cattle thieves. There was no evidence at the trial that these charges were true. There was evidence that Reeder made the charges when he visited Kansas City for the purpose of making the arrest, and that he made them in the hearing of the reporters of the plaintiffs in error before their articles were published. The requisition papers were received in evidence, and the fact was proved that they were seen and examined by these reporters before the publications were made. The jury returned a verdict of $2,500 against the World Company, of $2,685 against the Journal Company, and of $4,580 against the Times Company; and it is the judgments upon these verdicts which the writs of error have been sued out to reverse.

Frank Hagerman, D. B. Holmes, and Frank P. Sebree (Henry C. McDougal and L. C. Krauthoff, on the brief), for plaintiffs in error.

I. N. Watson and Shannon C. Douglas, for defendant in error.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

SANBORN, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

"A good name is rather to be chosen than great riches, and loving favor rather than silver and gold." The respect and esteem of his fellows are among the highest rewards of a well-spent life vouchsafed to man in this existence. The hope of them is the inspiration of his youth, and their possession the solace of his later years. A man of affairs, a business man, who has been seen and known of his fellowmen in the active pursuits of life for many years, and who has developed a good character and an unblemished reputation, has secured a possession more useful and more valuable than lands, or houses, or silver, or gold. Taxation may confiscate his lands; fire may burn his houses; thieves may steal his money; but his good name,

his fair reputation, ought to go with him to the end,—a ready shield against the attacks of his enemies, and a powerful aid in the competition and strife of daily life. Every man is presumed to be innocent of wrong until he is proved to be guilty; but, when a heinous crime is charged upon a man whose character and reputation for honor and integrity have been unquestioned for years in the community in which he has lived, that character and that reputation stand sponsors for his innocence, and raise a still stronger presumption, which accompanies him in public and in private, in court and in council, and in every situation in life, and which is acted upon and recognized daily by all men,—a presumption that such a man would not be guilty of such a crime. U. S. v. Shapleigh, 12 U. S. App. 26, 42, 4 C. C. A. 237, 246, and 54 Fed. 126, 135. The law recognizes the value of such a reputation, and constantly strives to give redress for its injury. It imposes upon him who attacks it by slanderous words, or by a libelous publication, a liability to make full compensation for the damage to the reputation, for the shame and obloquy, and for the injury to the feelings of its owner, which are caused by the publication of the slander or libel. It goes further. If the words are spoken, or the publication is made, with the intent to injure the victim, or with a criminal indifference to civil obligations, it imposes such damages as a jury, in view of all the circumstances of the particular case, adjudge that the wrongdoer ought to pay, as an example to the public, to deter others from committing like offenses, and as a punishment for the infliction of the injury.

These general propositions are unquestioned. But the books are full of learning and confusion as to how far malice in the libeler is an essential prerequisite to the enforcement of these liabilities. Much of the discussion arises from, and a large part of the confusion is caused by, the different meanings which this word has grown to have. In the ordinary acceptation of the term, it signifies ill will, evil intent, or hatred; while its legal signification is defined to be "a wrongful act, done intentionally, without legal justification or excuse." Darry v. People, 10 N. Y. 120, 139; Buckley v. Knapp, 48 Mo. 152, 161; Clements v. Maloney, 55 Mo. 352, 359. When we come to read the text-books and the opinions of the courts on this subject, we find the writers and the judges using the word alternately with one and the other meaning, so that close attention to the sense in which it is used in each instance is requisite to a clear understanding of the statements of the writers and of the decisions of the courts. In many decisions it is laid down as a settled rule that malice is essential to a recovery in an action of libel, but that it is conclusively implied from the unprivileged publication of a false charge which is libelous in itself. Buckley v. Knapp, 48 Mo. 161; Callahan v. Ingram, 122 Mo. 355, 370, 26 S. W. 1020. This, indeed, is a settled rule of law, and it is obviously a correct statement where "malice" means, as it does in this declaration, that kind of malice which is always inferred from "a wrongful act, done intentionally, without justification or excuse"; for it is a truism to say that malice is the conclusive inference from such an act, and that, since the publication of a false charge that is libelous per se

is without justification or excuse, malice is implied therefrom. This declaration of the law has exactly the same practical effect as the more simple and more philosophic rule that malice, in the common acceptation of the term,—that is to say, ill will, evil intent, bad motive,—is not required to be either pleaded or proved to entitle the injured party to recover the actual damages he has sustained from the unprivileged publication of a false and libelous charge. The person libeled is as clearly entitled to full compensation for the loss he has sustained from a wrong inflicted with a laudable motive, or through mistake or inadvertence, as from one perpetrated from a bad motive, or with a diabolical intent. Ullrich v. Press Co. (Sup.) 50 N. Y. Supp. 790, 798; Hamilton v. Eno, 81 N. Y. 126; King v. Root, 4 Wend. 127. It is a corollary to these rules that it is no justification for the publication of such a libel that another had spoken or written the false charge, and that the libeler simply repeated his statement, and that he gave the name of his informant. It is no defense to an action of trespass that another trespassed, and informed the defendant how to do it without expense or trouble; and it is no excuse or justification for an injury to a fair reputation that another has commenced to besmirch it, and has furnished the pigments to carry on the nefarious undertaking. Sans v. Joerris, 14 Wis. 666; Newman v. Foster, 8 Wend. 602; Odgers, Libel & Sland. p. 124.

But may exemplary or punitive damages be recovered for a libelous publication, without proof of ill will, hatred, or an intent on the part of the libeler to injure his victim? Punitive damages are given as an example to the public, to deter others from committing a like offense, and as a punishment to the wrongdoer. They are never allowable where the defendant, after due investigation, in good faith, with reasonable cause to believe the charge to be true, has published it from a proper motive, in the honest belief that it is true. Are there, however, no circumstances under which the jury may award exemplary damages, in the absence of proof of actual evil intent or bad motive on the part of the defendant? May the libeler shut his eyes, and blindly publish heinous charges against men and women of spotless character and unsullied reputation, and still escape liability for everything except the actual damages which they can prove, because he had no intention to injure them, no care about them, but simply sought to make money from the sale of the racy story? If he may not, where is the dividing line, and who shall determine in each case, the court or the jury, whether or not exemplary damages shall be allowed? It is not every degree of negligence, it is not a mere mistake or inadvertence occurring in the course of a reasonable investigation, that will lay the foundation for exemplary damages for the publication of a libel; and yet every man is bound to use his own property and pursue his own vocation in such a way that he may not unlawfully injure the property or violate the rights of his neighbors. Not only this, but when his property or his vocation borders upon or impinges upon the property or rights of his fellow men, he is bound to exercise ordinary care to ascertain the extent of that property and of those rights, and to abstain from unnecessarily injuring them.

In Durant Min. Co. v. Percy Consol. Min. Co., 93 Fed. 166, an action of willful trespass, this court held that the plaintiff might recover more than his actual loss if the trespass was willful and intentional, and that the jury might "lawfully infer that a trespasser had knowledge of the right and title of the owner of the property upon which he entered, and that he intended to violate that right, and to appropriate the property to his own use, from his reckless disregard of the owner's right and title, or from his failure to exercise ordinary care to discover and protect them." It is difficult to perceive why a jury might not likewise infer an intent to violate the rights of a plaintiff, in a libel suit, from a stolid indifference to, or reckless disregard of, them.

In Day v. Woodworth, 13 How. 363, 371, the supreme court declared that exemplary damages might be allowed by the jury in "actions of trespass, where the injury had been wanton or malicious, or gross and outrageous."

In Railroad Co. v. Quigley, 21 How. 202, 214, an action of libel, that court held that:

"Whenever the injury complained of has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not limited to the ascertainment of a simple compensation for the wrong committed against the aggrieved person. But the malice spoken of in this rule is not merely the doing of an unlawful or injurious act. The word implies that the act complained of was conceived in the spirit of mischief, or of criminal indifference to civil obligations."

In Railway Co. v. Arms, 91 U. S. 489, 493, an action of negligence, Mr. Justice Davis, in delivering the opinion of the court, said:

"Redress commensurate to such injuries should be afforded. In ascertaining its extent, the jury may consider all the facts which relate to the wrongful act of the defendant, and its consequences to the plaintiff; but they are not at liberty to go further, unless it was done willfully, or was the result of that reckless indifference to the rights of others which is equivalent to an intentional violation of them. In that case, the jury are authorized, for the sake of public example, to give such additional damages as the circumstances require. The tort is aggravated by the evil motive, and on this rests the rule of exemplary damages."

In Bennett v. Salisbury, 45 U. S. App. 636, 639, 24 C. C. A. 329, 331, and 78 Fed. 769, 771, the circuit court of appeals of the Second circuit held that exemplary damages might be recovered in an action of libel, although the defendant had no ill will or intent to injure the plaintiff, if he was guilty of "such wanton disregard of, or such reckless indifference to, the rights of others as was equivalent to the intentional violation of such rights."

Through all these and many other authorities the thought runs that a reckless disregard of the rights and feelings of others may be equivalent to an intentional violation of them, and that, where such recklessness exists, punitive damages may be allowed, in the discretion of the jury. A moment's consideration will show, however, that wherever the violation of the rights of one who is slandered or libeled results from a reckless disregard of those rights by the libeler, that disregard is the equivalent of an intentional violation of them. Every man is presumed to intend the natural and probable effects of his acts and omissions. The natural and probable effect of the reckless

disregard by the publisher of a newspaper of the rights of his fellow men to their good names and fair reputations is the violation of those rights, and hence the reckless disregard of them becomes equivalent to an intentional violation of them. Moreover, every reason for the allowance of exemplary damages applies with as much cogency and force to a libel published with a reckless disregard of the rights of the libeled as to one published with an evil intent or a bad motive. Such damages are allowed as an example to the public, and as a punishment to the wrongdoer. The main purpose of their allowance is to protect the characters and reputations of those who have not been attacked, and to warn all men not to destroy or injure the names that are still good and the reputations that are yet fair. The interests of these citizens and of the public demand the protection of their reputations against assaults that would destroy them with a reckless disregard of the rights of their owners as forcibly as they do that they shall be protected against those inspired by hatred or ill will. The effect of libels published with recklessness is as deleterious as that of libels published with ill will. In truth, the demand for the protection against libelous publications made with stolid indifference to, and reckless disregard of, the rights of those injured, is far more urgent than the demand for protection against those published with hatred, because the former are usually inspired by avarice, and are as much more numerous and as much more dangerous to individuals and the public as avarice is more prevalent than spite.

Turn it as you will, the reason of the rule and the great weight of authority upon the subject lead alike to this conclusion: Exemplary damages may be allowed by the jury, in actions of libel, when, upon a consideration of all the facts and circumstances of the case, they find that the publication has been made with a reckless disregard of the rights and feelings of the person libeled, as well as where they find that it has been inspired by hatred or ill will towards, or an intent to injure, him. Bennett v. Salisbury, 45 U. S. App. 636, 639, 24 C. C. A. 329, 331, and 78 Fed. 769, 771; Ullrich v. Press Co. (Sup.) 50 N. Y. Supp. 788, 792; Samuels v. Association, 75 N. Y. 604; Bergmann v. Jones, 94 N. Y. 51, 62; Holmes v. Jones, 121 N. Y. 461, 467, 24 N. E. 701; Warner v. Publishing Co., 132 N. Y. 181, 184, 31 N. E. 393; Holmes v. Jones, 147 N. Y. 59, 61, 41 N. E. 409; Smith v. Mathews, 152 N. Y. 152, 158, 46 N. E. 164; Young v. Fox (Sup.) 49 N. Y. Supp. 634; Shanks v. Stumpf (Sup.) 51 N. Y. Supp. 154; Callahan v. Ingram, 122 Mo. 355, 371, 372, 26 S. W. 1020; Buckley v. Knapp, 48 Mo. 161; Clements v. Maloney, 55 Mo. 352, 359.

It is ordinarily a question for the jury to determine, in view of the particular circumstances of each case, whether or not punitive damages should be allowed, and the amount of the allowance is exclusively within their province. Day v. Woodworth, 13 How. 370; Scott v. Donald, 165 U. S. 58, 89, 17 Sup. Ct. 265; Holmes v. Jones, 147 N. Y. 59, 67, 41 N. E. 409. The constitution of the state of Missouri, where these actions were tried (article 2, § 14), provides that:

"In all suits and prosecutions for libel the truth thereof may be given in evidence, and the jury, under the direction of the court, shall determine the law and the fact."

The questions which have now been discussed were presented in various forms in the trial of the cases before us; and have been properly saved for our consideration. It seemed conducive to a convenient and expeditious disposition of the cases to consider them before stating the details of the exceptions which raise them. We turn to a consideration of these exceptions. The main point of attack is the charge of the court. The plaintiffs in error did not plead or prove the truth of the charges for the publication of which these suits were brought, but they produced evidence to the effect that Sheriff Reeder originated the charges, and stated them to their reporters before their publication, and they prayed in their answers, and in four requests which they presented at the close of the trial, that they might prevail on account of this pleading and proof. The court carefully read to the jury the three libels, stated clearly the contents of the answers of the plaintiffs in error, and then addressed itself in their order to the questions of justification, mitigation of damages, compensatory damages, exemplary damages, and some special phases of the cases against the Times Company and the World Company. The trial judge properly charged the jury that the fact that the libelous matters published were told to the publishers by another was no justification for their publication, and that proposition of law is not challenged in this court, although, as we have said, the judge was asked to hold the counter proposition at the trial, and exceptions were taken because he refused. The complaint now is that there was error in the charge of the court on the question of damages, and we have called attention to the fact that this question of justification was presented and urged upon the court below because many of the statements of the judge that are now challenged as tending to induce error in the assessment of damages were not addressed to that subject at all, but to the question of justification alone. For example, he said:

"The repetition of slander uttered by publication in the newspaper makes the publisher of that scandal or libel as much responsible in law for the act of publication as if the newspaper were the originator of the slander; the information they received, as you will be advised by the court later on, going to the question only of damages."

This was a correct statement of the law. The court did not say that the publisher would be liable for as much damages as the originator, but that he would be as much liable, and he was speaking, not of the amount of damages, but upon the question of a justification of the publication.

It is assigned as error that the court instructed the jury that, if the defendant in error recovered, he would be entitled to compensatory damages, and then said that by "compensatory damages is meant simply such sum of money, such round sum in measurement, as in the judgment of the jury will compensate him for injury done to his feelings and his character and reputation."

He then told them that the action was not founded on special damages resulting from loss of business or trade, but on general damages for defamation of character, injustice, and indignity. This assignment is leveled at the adjective "round," and it is contended that its meaning is large, and that its use deprived the jury of the privilege of returning nominal damages. To our mind it has no such significance, and we are unable to persuade ourselves that it had any such meaning to the jury. In our opinion, it was used, and rightly used, to describe a lump sum, in contradistinction from one that is the result of calculation or of exact computation.

The statutes of the state of Missouri require that, in all actions where punitive damages are recoverable, the jury shall separately state the amount thereof in their verdict (Laws Mo. 1895, p. 168), and it is insisted that the court erred because it told the jury to assess such damages in these cases as they deemed just and right, and did not require them to separate the exemplary damages from the actual damages. We have searched this record in vain for any request on the part of the plaintiffs in error for such a separate assessment, nor do we find that this statute or this objection was in any way called to the attention of the court when the charge was delivered and the exception taken. The function of this court is to review the supposed errors of the court below. There is no error here for us to review, because this question was not presented to, or decided by, that court. Moreover, if it had been, there was no error in the instruction given or the practice adopted by the trial court. The federal courts are not required to follow subordinate provisions of state statutes which would incumber the administration of the law or tend to defeat the ends of justice in their tribunals. O'Connell v. Reid, 12 U. S. App. 369, 378, 5 C. C. A. 586, 592, and 56 Fed. 531, 537.

The next subject for our consideration is the charge of the court upon exemplary damages. While treating the subjects of justification and compensatory damages, the court defined "malice," in its legal sense, to be "a wrongful act, done intentionally, without legal justification or excuse," and used it in that sense throughout its instructions. It told the jury that no justification of the publication of the libels had been pleaded or proved, that malice was implied from their publication, and that the defendant in error was entitled to recover compensatory damages. This was a correct statement of the law, under all the authorities. White v. Nichols, 3 How. 266. When the court came to the subject of exemplary damages, it said to the jury:

"As I have already stated to you, gentlemen of the jury, the publication of libelous matter in a newspaper, that is false, and without justification or legal excuse, itself expresses malice, and entitles the parties to recover thereon. These publications can be made under circumstances which entitle the party to something more than what is called 'compensatory damages.'"

It then proceeded to give the portion of the charge on compensatory damages which has been considered, and continued in this way:

"It is also permissible for the jury to award, in libel cases, what is known as 'punitive' or 'exemplary' damages; that is, damages by way of punishment to

the party for doing recklessly and wrongfully an injury to another, or exemplary damage such as would be an example to the community to prevent such wrongs and injustice to society, to punish the party. Now, gentlemen of the jury, you are to determine for yourselves, from all the evidence in this case, as to whether or not you give the party punitive damages. Look at all the circumstances and facts in the case, to see whether this publication was made under circumstances such as to entitle the plaintiff to recover punitive damages."

This portion of the charge is vigorously assailed. It is contended that it is erroneous (1) because the charge on malice was not accompanied "with a further charge that, in the absence of express malice or its legal equivalent, there could be no recovery of exemplary damages"; (2) because "the proper legal definition as to what is sufficient to authorize exemplary damages was not given by the court, and the evidence did not warrant the charge on the subject"; and (3) because the court refused to give to the jury instructions 5, 7, and 8, which were requested by the plaintiffs in error, and which read in this way:

"(5) If you find, from all the circumstances, that there was no malice on the part of any one of the defendants towards the plaintiff inducing or actuating the publication complained of against that defendant, then you can give no damages against such defendant on account of such malice."

"(7) If a newspaper is advised by officers of the law, or other persons, that a given party has been guilty of an offense, and publishes that fact in good faith, and without any actual malice against such person, mentioning the source of its information in such publication, and having reasonable ground to believe that the facts stated are true, then such defendant cannot be charged with punitive damages by reason of such publication.

"(8) The jury are instructed that it is competent for a newspaper publisher to show, in mitigation of any punitive damages sought to be recovered from it for the publication of a libel, that it acted upon information received by it, and that it had reasonable cause to believe, and did believe, that the particular publication complained of was true at the time it was made, although it may have developed, by subsequent occurrences, that as a matter of fact such statements were not true."

The relation of malice to the action of libel, and to the recovery of exemplary damages, has been purposely discussed in the earlier part of this opinion, and it is only necessary here to compare the charge of the court with the conclusions there stated. In brief, they were that malice, in the legal sense in which the court below used it, is implied from the publication of an unprivileged libel; that malice, in the ordinary sense,—that is to say, ill will, hatred, or an intent to injure the person libeled,—is not essential to the recovery of compensatory damages in an action for libel; and that exemplary damages may be recovered either when the publication is inspired by ill will or an intent to injure the victim, or when it is made with a reckless disregard of his rights. A comparison of the charge of the court with these conclusions shows that it is in strict accord with them. The court spoke of malice in its legal sense. Taken in that sense, it was implied from the publication of the libels, and it remained implied throughout the entire trial, for the purposes of compensatory, as well as of exemplary, damages. In many cases this implied malice would be insufficient to warrant exemplary damages. But this implied malice, together with a conscious indifference to, or a wanton or reckless disregard of, the

rights of the defendant in error, was sufficient, even in the absence of ill will or an intent to injure, as we have already seen, to warrant an award of these damages. This was the effect of the court's charge. There was no direct evidence of ill will, or hatred, or intent to injure the defendant in error, on the part of the publishers of these libels; and their agents testified, truthfully, no doubt, that they had none. The real question was, not whether or not these agents were inspired by spite or ill will, but whether or not they had made the publications with a wanton or reckless disregard of the rights of Carlisle. The court very properly confined its charge on this subject of punitive damages to this question. It told the jury that they might allow exemplary damages for doing recklessly and wrongfully the injury which had been inflicted upon the defendant in error, and that they must look at all the circumstances and facts in the case, and decide for themselves whether the publications were made under such circumstances as would justify such an allowance. "Recklessly" signifies with a wanton disregard of all consequences, and hence of the violation of all rights, and its use presented to the jury the proper rule for their guidance upon the question under consideration. Cent. Dict. "Reckless"; Plummer v. Kansas City, 48 Mo. App. 484; Railway Co. v. Adams, 26 Ind. 78; Cobb v. Bennett, 75 Pa. St. 330. The result is that the objections that the court did not instruct the jury that there could be no recovery of punitive damages, in the absence of express malice or its legal equivalent, and that it did not give the proper definition of what was necessary to warrant the recovery of such damages, must fall, because it declared that the publishing of libels recklessly and wrongfully was the legal equivalent of express malice, and that such a publication would warrant the recovery of exemplary damages.

The objection that there was no evidence to warrant the consideration of exemplary damages by the jury must share the same fate. A merchant of unspotted character and unblemished reputation, residing and engaged in mercantile business in the city where these publications were made, was arrested on the affidavit of a stranger, who lived hundreds of miles away, for knowingly having in his possession eight stolen cattle. This affidavit was accompanied with the usual information, verified by the district attorney of a county in Utah, and by the necessary affidavit of the assistant district attorney of the same county for a requisition, with the usual requisition, and with an order for his arrest. When he was arrested, he and his attorney protested to all the agents of the plaintiffs in error who inquired of him that he was innocent of this charge. An account of his arrest, and of the charge against him, was published, and of this he made no complaint. The sheriff of Mesa county, who arrested him, and who, so far as this record discloses, was a stranger to the agents and employés of the plaintiffs in error, said in their hearing that the defendant in error had been operating with, and associated with, and had been the head of, a gang of cattle thieves. The publication of this charge is the foundation of these suits. The defendant in error was in Kansas

City. To many of the residents and citizens of that town he was not unknown. His character and reputation for honesty and integrity were easily ascertainable in the city where these publications were made. We have searched this record in vain for any evidence that, before this charge was published, any of the agents or employés of the plaintiffs in error made any effort, by inquiry of any of the acquaintances of the defendant in error, except of the sheriff of Mesa county and the police of Kansas City, who, they knew, were repeating these charges on his statement alone, to ascertain whether or not it was true, or that they ever even asked the defendant in error or his attorney whether or not he was the head of a gang of cattle thieves, or was associated or operating with them. The reputation of this man rested under the legal presumption that every man is presumed to be innocent until he is proved to be guilty, and under the still stronger presumption on which all men constantly act, in social and business transactions, that a man of 40 years of age, who has established a good reputation, would not be guilty of such a crime. The plaintiffs in error disregarded these presumptions, and published the story of the sheriff. A sworn charge of crime carries with it no presumption of truth; much less does the gossip of an officer. The trial judge thought that the publication of this story, under these circumstances, presented substantial evidence of the reckless disregard of the rights and feelings of the defendant in error, which he was not authorized to withdraw from the jury upon the question of the allowance of exemplary damages, and we are all of the same opinion.

Another contention of counsel for plaintiffs in error, under this exception, is that punitive damages cannot be recovered of their clients, because they are corporations. But the charges which they published were gathered and circulated in the course of their ordinary business by their agents who were acting within the scope of the authority and duty intrusted to them, and for "acts done by the agents of a corporation in the course of its business and of their employment a corporation is responsible in the same manner and to the same extent as an individual is responsible under similar circumstances." Railway Co. v. Prentice, 147 U. S. 101, 109, 13 Sup. Ct. 261; Railroad Co. v. Quigley, 21 How. 202, 210; Bank v. Graham, 100 U. S. 699, 702; Salt Lake City v. Hollister, 118 U. S. 256, 261, 6 Sup. Ct. 1055; Railway Co. v. Harris, 122 U. S. 597, 608, 7 Sup. Ct. 1286.

The conclusions already announced practically dispose of the refusal to give the three instructions requested. The fifth was a mere truism, from the failure to give which it is evident that no prejudice could possibly have arisen. It was a request to say to the jury, in effect, if you find no malice, you can give no damages on account of malice, or, in other words, you will give no effect to a nonexistent cause. No prejudice can arise from the refusal to give such an instruction. It may be further said that in these cases malice, in the legal sense, was implied from the publications, and the jury were not at liberty to find that it did not exist, while

malice, in the sense of ill will, was not essential to a recovery, so that the only effect of the instruction, if given, would have been to mislead or to puzzle the jury. The seventh instruction was properly refused, because it did not present the crucial question in the case,—whether or not the publications were made with a reckless disregard of the rights of the defendant in error,—while the charge of the court tersely and fairly presented it, because it was framed on the erroneous theory that there could be no recovery of exemplary damages unless the publication of the libel was inspired by actual malice or ill will, and because it assumed that the jury were at liberty to find that some of the plaintiffs in error had published the libels in good faith and with reasonable ground to believe that all the libelous matter which they published was true, when the facts proved were insufficient to warrant such findings. There was some of the libelous matter published by the World Company and some of that published by the Journal Company that there is no evidence that either of them had reasonable ground to believe; and, in the case of the Times Company, notice of the falsity of the charges was repeatedly given to its agents by Carlisle and his friends before they were published, and its city editor testified that all they knew about them from any other source was that the sheriff said he believed them. A publication under such circumstances could not have been made "in good faith." Lee v. Bowman, 55 Mo. 400; Coover v. Johnson, 86 Mo. 533. The eighth request was properly refused because it assumed that the jury were at liberty to find that some of the plaintiffs in error believed all of the libelous matter which they published, while there is no evidence in the record that any of them, or any of their agents, ever had such a belief.

On the evening of the day of the arrest, a friend of the defendant in error and his partner went to the office of the Times Publishing Company, met the city editor, told him that the charges against Carlisle contained in the article which had been published on that day in the Kansas City Star, and which was then before him, were false, and that Carlisle was innocent, and, according to the testimony of the city editor, demanded that he should print nothing about it. The article subsequently published in the Times the next morning contained substantially the same charges made in the article in the Star. When the interview with Mr. Carlisle's friend and partner took place, the Times article had been written by the police reporter, and either at or after this interview the city editor inserted a statement to the effect that the defendant in error claimed that he was entirely innocent of the charge, and then published it. Before preparing the article the police reporter had talked with Carlisle, and the latter had told him that the charge against him of receiving the stolen cattle was trumped up, and his attorney, Watson, had informed him that Carlisle could prove his innocence of it. In answer to the question why he published the statements in the Times article of charges other than that for which the arrest was made, the city editor of the Times testified:

"Now, this man Reeder. The only thing, according to his statement,—the only specific charge they could get against this man,—was he had received eight head of cattle. But this man Reeder, who came from Colorado, believed that Mr. Carlisle was the head of an organized gang of cattle thieves. I say he believed it, and that was all we knew about it."

When the friend of Carlisle protested against the publication of the matter in the Star, the night before the Times Company published its article, this city editor replied that he intended to publish it anyway, and his assistant, or some other person in the office, added an injunction to read the Times and keep posted. It is assigned as error that the court below, in presenting this evidence to the jury, stated it incorrectly, and then instructed them, in effect, that when a newspaper is warned and notified that a charge is false, wrong, and trumped up, and then proceeds to publish it, it thereby affirms it, becomes sponsor for it, and answerable to the party injured, and that it was for them to say, under all the circum-stances of the case, whether, if the Times Company published the libel, even with the addition to the effect that Carlisle claimed to be entirely innocent, it did or did not exhibit a wanton disregard of the rights of others. The testimony of the witnesses in the case of the Times Company has been carefully compared with this part of the charge of the court. There are verbal inaccuracies in the statement which the court made of this evidence. In some instances testimony attributed to one witness was given by another, but the substance and effect of the testimony relative to the action of the Times Company was clearly and fairly stated by the court, and the law was correctly declared. There was no just ground for exception to this part of the instructions to the jury.

It is assigned as error that the court below refused to permit the introduction of proof of the article in the Star, and its publication, in mitigation of damages, and that, while it admitted proof of the fact that this article was before the city editor of the Times and the friend and partner of Carlisle at the interview on the evening of February 20th, it restricted its effect to that fact. But the article in the Star was not evidence of the truth of the statements it contained, and it was not admissible in mitigation of damages in the action against the Times Company, because it was not pleaded in its answer in that case. For the same reason the offer to prove, by the testimony of the reporter of the Star, that he communicated what Reeder had told him to the reporters of the plaintiffs in error before they published their articles, was properly rejected. Neither of the answers pleaded or suggested the article in the Star or the story of its reporter as one of the sources which induced the plaintiffs in error to make such publications. In jurisdictions which have adopted the Code, matter in mitigation of damages must be pleaded before it can be proved. Rev. St. Mo. 1889, § 2081; Northrup v. Insurance Co., 47 Mo. 435, 444; Burt v. Newspaper Co., 154 Mass. 238, 244, 28 N. E. 1; Hewitt v. Pioneer-Press Co., 23 Minn. 178.

It is also assigned as error that the reporter of the Star was not permitted to testify in these actions to what Sheriff Reeder told him at the time of the arrest of Carlisle. As we have already seen, his testimony upon this subject was not competent in mitigation of

damages, but it is suggested that it was admissible for the purpose of contradicting and impeaching the testimony of Reeder. A perusal of Reeder's testimony, however, discloses the fact that no foundation was laid therein for his impeachment. No questions were asked him which would allow of his impeachment by the testimony of this reporter.

In connection with the rejection of this testimony, much complaint is made of the action of the court in the submission of the evidence upon the question of mitigation of damages to the jury. The record and the charge have been carefully examined upon this subject, with the result that it seems to us that this complaint is not warranted. The court expressly charged the jury that, while the answers did not plead justification, they set out the facts and circumstances out of which the publication of these articles grew, for their consideration on the question of the mitigation of damages and that they should look at all the circumstances and facts in the case to see whether the publications were made under such circumstances as to entitle the defendant in error to recover punitive damages. All the requisition papers had been received in evidence. The reporters of the plaintiffs in error had been permitted to testify fully to their examination of these papers, and to all that Sheriff Reeder had told them. With this evidence before them, these instructions gave to the jury all that the plaintiffs in error had pleaded, and all that they had proved, for their consideration upon the question of mitigation of damages, and they were too plain for mistake, misconstruction, or misunderstanding.

When the charge of receiving the eight head of stolen cattle was dismissed by the court in Colorado, the World Company published an article, purporting to be signed by Sheriff Reeder, to the effect that the charge had been dismissed by the entry of a nolle prosequi, and that the defendant in error was thoroughly vindicated in a lengthy opinion on the merits of the case submitted by the district attorney. The Journal Company and the Times Company made no publication of these facts, and did not publish the fact that the defendant in error brought these actions. In its charge the court called the attention of the jury to the publication of this article by the World Company, told them that if, when a publisher ascertains the fact that he has done an injustice, he makes the amende honorable, says he has done a wrong, he has then acted the manly part; public opinion and juries ought to appreciate such an act; and the jury ought to consider this later publication by the World pany in mitigation of damages. It is assigned as error on the of the Journal Company and of the Times Company that when court gave this charge, and while speaking of a publisher, it ed:

But if, having slandered you and libeled you, he doggedly remains reticent ,m that day forth, leaving you to run down and to catch this swift-footed .ander that goes through the world, that is another question for the jury."

But this statement of the court was certainly true in fact, and we are unable to discover why it is not true in law. A different question is surely presented, when a jury is to consider the damages to

be allowed for a publication of a false charge of crime which has been promptly retracted, from that which is presented when it is to assess the damages for one that has not been withdrawn. One of the crucial questions in this case was whether the publications were made with wanton indifference to, and reckless disregard of, the rights and feelings of the defendant in error. Silence after he was vindicated, and silence when he sued for the publication of the libels, presents this question in a far different light from that in which a prompt publication of the vindication places it. Publishing Co. v. Hallam, 16 U. S. App. 613, 645, 8 C. C. A. 201, 206, and 59 Fed. 530, 535.

Another portion of the charge to which objection is made reads in this way:

"One of the counsel in this case argues that Mr. Carlisle never went to the papers, and asked them to make these corrections. Gentlemen of the jury, it is not the duty—it is not required—of a citizen, when a newspaper libels him, if it does libel him, to go and hunt the libeler up, and entreat and implore him to rectify it. It is the duty of the publisher to look out for the facts, and to make corrections if the facts warrant it. It is not the duty of a man to go to them."

There is nothing questionable in this excerpt from the charge, except the last sentence but one, and that must be read and interpreted in the light of the subject under discussion when it was delivered. If the question of which the court was treating had been whether or not a person libeled could recover damages for the failure of the libeler to discover the truth and publish it after he had circulated the libel, and the court had charged that he might, such an instruction would undoubtedly have been error. But this was not the subject under consideration here, and this was neither the meaning nor the effect of the declaration of the court. The question under discussion was whether or not the fact that the defendant in error did not go to the publishers, and tell them the facts, and demand a retraction, after the libels were circulated, was any justification or excuse for their original publication. The court properly charged that it was not, and the remark that "it is the duty of the publisher to look after the facts, and to make corrections, if the facts warrant it. It is not the duty of a man to go to them,"—was used arguendo, only to support and enforce this rule, and not to announce another and an entirely different proposition of law, which was not in the mind of either court or jury. The connection in which these words were used made it impossible for the jury to misunderstand them, and in that connection their use was not erroneous.

Many assignments of error are made, and much complaint is indulged in, because the court below limited the effect of the requisition papers when they were received in evidence. An examination of these exceptions discloses the fact that the real objection to this limitation was that the court did not permit their use for the purpose of proving the truth of the facts which they recited. The proposition that the affidavit of the complaining witness, or the affidavits of the officers based upon it, constitute any evidence of the truth of the charges made therein, in these actions of libel, is unworthy of consideration. It is said, however, that great injustice was done

because the court failed to mention in its charge the affidavit of the assistant district attorney upon which the application for a requisition was granted. But the foundation of the requisition proceedings was the affidavit of the complaining witness, Chipman. No complaint is made that this was not mentioned to the jury. This affidavit was accompanied with the affidavit of the district attorney, or the information, and with the affidavit of the assistant district attorney, or the application for the requisition. But it is common knowledge that the affidavits of these officers are generally based upon the complaint of the witness who makes the charge. They do not purport to rest upon personal knowledge, but upon the information presented by the prosecuting witness; so that, when his affidavit is received, these formal affidavits of the officers are not of surpassing importance. Moreover, it was entirely in the discretion of the trial court to mention such affidavits, or to fail to mention them, in its charge, provided it fairly reviewed the evidence presented by the contesting parties. Our conclusion is that the failure to mention the affidavit of this assistant district attorney was the exercise of the discretion of the court in reviewing the testimony, with which we cannot interfere, and that the case presents no evidence of an abuse of that discretion, or of any injustice resulting from the manner of its exercise.

The entire charge of the court is challenged as partial and inflammatory. Careful and repeated readings of it, and of every objection made to it, have led us all to the conclusion that it was, on the whole, a just and fair presentation of the law and the facts of these cases. The truth undoubtedly is that the plaintiffs in error published the libels without special ill will or spite against Carlisle, on the theory that they were warranted in doing so because the sheriff of Mesa county made the charge they contained in the hearing of their reporters. This was a fatal mistake. Its commission left them without any defense against judgments for some amounts in these actions. The only question the cases really presented was what the amounts of the judgments should be. This was not all. The publication of the charge that Carlisle had been operating with, or associated with, or had been the head of, a gang of thieves, on the statement of this sheriff, without investigation or inquiry concerning its truth of any one but their informant and those who were repeating it on his information alone, in the face of the presumption of innocence, which the law throws around the upright man who has established a character for honesty and integrity, indicates so grave an indifference to and disregard of a right of the defendant in error deemed precious by every honorable man,—the right to the preservation of his good name unsullied,—that the court could not lawfully refrain from submitting to the jury the question of exemplary damages. We fear that counsel for the plaintiffs in error, in their criticisms of the trial court, have forgotten some of these facts. They have been instant in season and out of season in the defense of these cases. With rare skill and ability they have presented to the court below, and to this court, every consideration—every suggestion—favorable to their clients. But they were defending cases which the law forbade them

to completely win. It is hard to conduct a contest that must be lost. It is trying to receive with equanimity adverse rulings that are fatal to a defense, although expected and known to be right. We fear that the heat of the strife, the zeal of the advocate, and the unavoidable annoyance of inevitable defeat, have produced some obliquity of vision on the part of the counsel for the plaintiffs in error when they look at the charge of the court. Some of their criticisms of it seem to us to attribute strained and unnatural meanings to plain and correct declarations of law, and to apply other declarations to subjects to which they had no reference. In some of their criticism we fear they forgot for the moment that it was the duty of the court to declare the law applicable to the facts of these cases, to announce that the publications were not justified, and to submit the question of punitive damages to the jury, whatever the effect of this action might be upon the parties to the suit, while their duty was discharged when they considered the law and the facts solely with reference to their effect upon their clients. The facts in these cases were such that an impartial statement of them, and a clear and concise enunciation of the law which applied to them, could not be made welcome to counsel for the plaintiffs in error or to their clients. A hesitating, confused, and obscure presentation of the law and the facts might have been more favorable to them, but no just exception can be taken because correct declarations of law are plainly and forcibly given, or because apt and impartial references to the salient facts of a case are made. There were, as we have said, some inaccuracies in some of the court's statements of the facts. In a few instances testimony given or a statement made by one witness or person was attributed to another. But the court did not undertake to recite or refer to all the evidence, the mistakes in its references to it were insubstantial and ineffective, and the whole question of the existence and effect of the evidence was left to the jury, in whose province it fell.

The more carefully we have studied the record, the rulings upon the evidence, and the charge of the court in this case, the more firm our conviction has grown that the trial was, on the whole, fairly conducted; that the references to the evidence in the charge were just and impartial; that the instructions to the jury contained a terse, clear, and correct statement of the law of the cases; and that there was no substantial error in the proceedings. This conviction is confirmed as we review the entire case, and the arguments and briefs of counsel, by the fact that the counsel for the plaintiffs in error assign more than 75 errors in each of these cases, and specify in their briefs 74 upon which they rely. None of them have escaped our consideration. But none of them which have not already been considered demand extended notice or discussion. The 48th, 49th, 50th, 51st, and 52d assignments are that the court did not instruct the jury to return a verdict in favor of each of the plaintiffs in error; that it allowed the defendant in error more than three peremptory challenges (Insurance Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909); that it refused to permit the plaintiffs in error to prove that Carlisle had not sued, or made any claim against, Chipman or his company for char-

ging him with receiving the eight stolen cattle; and that it refused to permit them to show that he had never made any claim against the Sheriff Reeder for the slander he had uttered. When counsel of the learning and ability of those who presented this case gravely announce to an appellate court that they rely upon 74 alleged errors for a reversal of judgments against their clients, and some of those specified turn out to be as frivolous as those we have just cited, it is at least difficult to resist a suspicion that they themselves were not certain there was any substantial error in the case. The judgments of the court below must be affirmed, and it is so ordered.