## ÆTNA LIFE INS. CO. v. MUTUAL BENEFIT HEALTH & ACCIDENT ASS'N.

### No. 10358.

Circuit Court of Appeals, Eighth Circuit.
Feb. 28, 1936.

Rehearing Denied March 23, 1936.

116

David A. Fitch, of Omaha, Neb. (Norris Brown and Ralph M. West, both of Omaha, Neb., on the brief), for appellant.

Yale C. Holland, of Omaha, Neb. (Philip E. Horan, of Omaha, Neb., on the brief), for appellee.

Before GARDNER, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

VAN VALKENBURGH, Circuit Judge.

This is an action for alleged libel. In this opinion the parties will be designated as in the trial court. The plaintiff is a Nebraska corporation organized upon the mutual assessment plan. Its business is limited to insuring its members against loss due to sickness or accident. The defendant is a Connecticut corporation operated for the profit of its stockholders, and writes a large volume of commercial forms of insurance, among them that of health and accident. Both companies operate in practically all the states of the Union. In 1931, and for several years prior thereto, both companies had offices in the city of Portland, Ore., had large sales organizations in that state, and had a considerable volume of business therein. They were, of course, competitors in the health and accident lines. One J. E. S. Buchanan was the general agent of the defendant at Portland, Ore. As a witness for defendant, he testifies that his territory as general agent was the state of Oregon and three counties in Northern California. He reported to no one in that territory, in which he was the chief officer of the Ætna Company. As general agent in that territory he selected, appointed, and trained agents, certain of whom reported to him and worked under his instructions. He had about fourteen of such subagents in Portland, and fifteen out in the state, who were writing health and accident insurance in 1931. He had the right to discharge as well as to appoint. It was a part of his job to help these subagents to get business and to educate them in the way of selling health and accident insurance. He gave them oral and written instructions. It was the custom to hold agency meetings for the Portland agents every Monday morning to take up new sales ideas, etc., and to dispense information thought to be advantageous.

April 4, 1931, Mr. Buchanan dictated the letter which forms the basis of this lawsuit. It was dated and mailed out April 6th, and reads as follows:

"Ætna Life Insurance Company
"Hartford, Connecticut.
"Portland, Oregon.

"J. E. S. Buchanan, General Agent
"Life, Accident and Group Departments
"Wilcox Building
"April 6, 1931.

"Ætna-Izers:

"Below find statement appearing in the Northwest Insurance News, April 1931 issue, Page 111, in connection with the Mutual Benefit Health and Accident Association, from which it would appear that if the Mutual Benefit Health and Accident Association would pay their claims outstanding, they would be broke. In addition to that, their total unpaid claims would exceed their total income by more than $671,000; even adding their surplus as regards policyholders of $336,000, they would still be $335,000 worse off than broke.

"As of December 31, 1930, the Mutual Benefit Health and Accident Association, Omaha assessment concern, had unpaid claims, totaling $1,249,310, according to its annual report as compared with a total of $1,184,155 the previous year, while its total income was $1,041,625 less than in 1929. Disbursements in 1930 amounted to $8,743,091 which together with the total unpaid claims of $1,249,310 aggregates $9,992,401, exceeding the total income by

$671,137. Surplus as regards policyholders is $336,281.

"Business in Oregon Also Declines.

"During the year the concern wrote 109,586 policies as compared with 143,184 the previous year of which number 4,531 were in Oregon where it wrote 6,130 in the year 1929. Its Oregon income in 1930 totaled $434,103, with claims paid in that state amounting to $317,755 for the year. Policies in force in Oregon on December 31, 1929, totaled 10,429 as compared with 8,779 at the end of 1930, those terminated amounting to 6,294 with 459 terminated by non-delivery during the year in that state.

"Death claims unpaid December 31, 1930, amounted to $115,690 with a total of sick and accident claims unpaid on the same date of $832,624.

"This information should be invaluable to you when you have to meet this assessment outfit in competition.

"J. E. S. Buchanan, General Agent."

He states that his secretary, Miss O'Dea, had many times before sent out circular letters to agents which he had dictated and authorized her to sign, but that no letter of this description, quoting from an article, ever went out before this time without his personal signature. Miss O'Dea testified that, as nearly as she could remember, "Mr. Buchanan dictated the letter and said, 'I would like to have you get that out.' * * * The mailing of this letter was quite unusual because of Mr. Buchanan's being so busy." She made about thirty copies, "mailing some to certain agents and putting some on the desks of the Portland agents."

Mr. Luther, defendant's vice president, testifies that he gave oral instructions to all agents, that circulars or letters referring to other companies "must not be used under any circumstances." He had no independent recollection of the conversation he had with Mr. Buchanan, but it was a regular custom, and he was very certain about it.

As to the effect of the letter, there was testimony on behalf of plaintiff that, subsequently to April, 1931, agents of plaintiff came in contact with a rumor that the defendant company was circulating a report that the plaintiff company was insolvent. One agent testifies that he learned of that report in talking with plaintiff's policyholders regarding the continuance of policies and the advisability of paying premiums. To this agent one or two only specifically connected the defendant's agents with this report; but there were many inquiries generally whether plaintiff was "insolvent, or worse off than broke, and we had to get out our financial statement to show them." One witness for plaintiff, living at Eugene, Ore., in 1931, and an agent for defendant, received the letter sued on, and, in the language of the record, testified that: "He read it over carefully a time or two and placed it with his other Ætna supplies he was in the habit of using when he solicited business. He carried the letter with him and showed it to probably thirty or more prospects. He cannot give the names of the people to whom he showed it. He carried the letter around and showed it to people in Eugene and Lane County. Eugene had a population at that time of about 19,000. Lane County at that time had a population of about 54,000."

Another witness, agent for plaintiff at the time, testifies that an agent for defendant asked him why he didn't "come over and work for a good company? The Mutual Benefit Health & Accident Association is broke. If they paid their claims they couldn't stay in business." He then produced the letter in suit, saying "All I have to do is to show this letter to prospective insurance buyers." Through an Ætna agent the letter was shown to another insurance agent who took it to show "to a fellow who was thinking of buying some health and accident insurance." Counsel for defendant introduced a number of witnesses, agents of defendant, who had not used the letter in any way. Some placed it in their files and forgot about it; others disregarded it. March 30, 1932, plaintiff filed this action in the District Court for the District of Nebraska, setting out the letter of April 6, 1931, and alleging that, by uttering and publishing said statement, defendant charged that plaintiff was insolvent and was incapable of performing the functions for which it was organized and intended. It asked special damages in the sum of $100,000, general damages in the sum of $250,000, and punitive or exemplary damages in the amount of $250,000.

Defendant by its answer denied that Buchanan was instructed or authorized to write the letter in question, or that defendant at any time approved or ratified

the same. It admitted that the letter was written as charged, but that it contained an article published in a magazine of general circulation in the state of Oregon, known as the Northwest Insurance News, which was the basis of the Buchanan letter; that Buchanan believed that the facts stated in said article were true; and that the writer acted in good faith and without malice. Defendant further pleaded that the letter was a privileged communication and that plaintiff, prior to the publication of said letter, did not have a good reputation in the state of Oregon and surrounding territory. The answer also contained the following paragraph: "Defendant further shows to the court that it is informed and believes, and therefore alleges, that the facts contained in said alleged publication were true, and defendant alleges that said publication was made with good motives, and for justifiable ends, and without malice." At the close of all the testimony defendant moved for a directed verdict, which motion was overruled, and an exception was allowed. Upon trial the jury returned the following verdict:

"We, the jury, duly empaneled, and sworn in the above entitled cause do find for the plaintiff, and we assess the total amount of its recovery at the sum of $6,-001.00.

"We further find that this sum consists of the amount of $6,000, which we allow because of damage on account of the general loss of plaintiff's business as defined in the court's instructions, and of the sum of $1 which we allow because of injury to the plaintiff's business credit and standing, as defined in the court's instructions."

Judgment was.entered accordingly.

The propositions of law relied on in brief and argument are:

1. That "it is only in respect to its credit, property, or business that a corporation can be injured by a libel"; and, in this connection, it is pointed out that plaintiff, as.alleged, is owned entirely by its policyholders, has no stockholders, and pays no dividends. It is contended that this libel, if in fact it be one, has not affected the interest of the policyholders; and, the corporation not being organized for profit, neither it nor its owners have suffered any damage in a legal sense.

2. It is insisted that this was a privileged communication.

3. Malice cannot be imputed to a defendant corporation unless it be shown that the corporation authorized or approved the act or participated in the wrong.

4. "Where an alleged libelous publication recites undisputed facts and the alleged libelous statement is based upon such undisputed facts, but such undisputed facts fail to sustain or support the alleged libelous statement, such alleged libel cannot be the basis to maintain an action."

5. The writing of the letter was not within the scope of Buchanan's employment.

1. We do not regard this first proposition advanced by defendant as entitled to serious consideration. Any corporation has the right to maintain an action of libel when a publication "assails its management or credit and inflicts injury on its business or property." Reporter's Association v. Sun Printing & Pub. Ass'n, 186 N. Y. 437, 79 N.E. 710, citing Newell on Slander. No differentiation in the cases generally is made between business corporations, so called, and nonbusiness corporations, and such corporations may recover in an action for libel without alleging and proving special damages. New York Society for Suppression of Vice v. McFadden, 260 N.Y. 167, 183 N.E. 284, 285, 86 A.L.R. 440. See Finnish Temperance Soc. Sovittaja v. Finnish Socialistic Publishing Co., 238 Mass. 345, 130 N.E. 845. Such a corporation can be damaged "by a tort that injures or lessens the value of its property, or affects adversely its business activities or reputation." Security Benefit Association v. Daily News Pub. Co. (C.C.A.8) 299 F. 445, 447.

The plaintiff has realized profit from its operations, although not organized for that specific purpose. It has property and has accumulated a surplus. Any injury to its credit and reputation would necessarily affect injuriously its business and property, and the interests of its policyholders as well. Such corporations have the right to acquire property which may produce profit and income.

"To decide that such corporations have no reputation acquired in the management of their affairs and property which can be injured or destroyed by a malicious libel, unless special damage is proved, would constitute a reflection upon the administration of justice." New York Society for·

Suppression of Vice v. McFadden, supra.

■■ 2. This was not a privileged communication within the legal conception of the term, nor under the authorities cited by counsel for defendant in support of this claim. To be privileged it must be honestly made, by a person interested in the subject-matter to one similarly interested, in order to protect that common interest. Newell, Slander and Libel (4th Ed.) § 432. The parties must stand in such a relation that it is a reasonable duty, or is proper, for the writer to give the information communicated. Wise v. Brotherhood of Locomotive Firemen and Enginemen (C. C.A.8) 252 F. 961, 963. The court in its charge instructed the jury that this communication was not privileged, and no exception was taken to that instruction, nor to any part of the court's charge. These two companies sustained no relations with each other and none was contemplated. It would be remarkable if a communication, having for its manifest object harm to the business of a competitor, could be viewed as a bona fide discharge of a public or private duty, legal or moral, in the prosecution of the writer's own rights and interests (White v. Nichols, 3 How. 266, 11 L.Ed. 591), and the protection of the common interest involved. It has yet to be accepted that any business is privileged to advance itself by pulling down a competitor through unfair trade practices. It is to be noted that defendant's contention in pleading and brief is that Buchanan had no authority to write such a letter, and its vice president testified that, when the letter was brought to his attention, he criticized Buchanan for preparing it. In the face of the attendant circumstances the plea of qualified privilege cannot be indulged.

3, 4, and 5. These three specifications are necessarily so closely related that they may more conveniently be considered together. The trial court in its charge to the jury specified the portions of the letter of April 6, 1931, as charged to be libelous, thus: "Ætnaizers Below find statement appearing in the Northwest Insurance News April 1931 issue, page 11, in connection with the Mutual Benefit Health & Accident Association from which it would appear that if the Mutual Benefit Health & Accident Association would pay their claims outstanding, they would be broke." And, also, this: "In addition to that, their total unpaid claims would exceed their total income by more than $671,000.00 even adding their surplus as regards policyholders of $336,000.00 they would still be $335,000.00 worse off than broke." And then said: "If you find that the defendant is responsible for the publication of this letter then the jury are instructed that these two portions of the letter, so far as they charge the insolvency of the plaintiff, were what is termed *libelous per se*, that is, in and of themselves."

■■ That these portions of the letter do charge insolvency cannot successfully be disputed. It may be true that to the insurance expert the figures quoted in the publication would not necessarily import insolvency; but to the ordinary person, unskilled and uninformed in such matters, and that is the test here [Walgreen Co. v. Cochran (C.C.A.8) 61 F.(2d) 357; Newell, Slander & Libel (4th Ed.) par. 267, p. 304], the language amounts to an express statement that plaintiff was insolvent, and would naturally be accepted as such. The writer, known as an experienced insurance man, undertakes to analyze and state the significance of the quoted figures to that effect. We have not here a case where the language used necessarily excluded the libel charged. The entire letter was framed to convey that specific meaning and was intended to be used by Ætna agents, in soliciting health and accident business, to divert so-called "prospects" from plaintiff to defendant. To us it is susceptible of no other construction, and was so understood by many interested persons. The question is "whether the jury are of opinion that what has been published with regard to the plaintiff would tend in the minds of people of ordinary sense to bring the plaintiff into contempt, hatred or ridicule, or to injure his character. The question is really the same by whomsoever the action is brought—whether by a person, or firm, or a company. * * * With regard to a firm or a company, it is impossible to lay down an exhaustive rule as to what would be a libel on them. But the same rule is applicable to a statement made in regard to them. Statements may be made with regard to their mode of carrying on business, such as lead people of ordinary sense to the opinion that they conduct their business badly and inefficiently. If so, the law will be the same in their case as in that of an individual, and the state-

ment would be libelous. * * * It is not necessary to prove any particular damage; the jury may give such damage as they think fit, having regard to the conduct of the parties respectively, and all the circumstances of the case." Finnish Temperance Soc. Sovittaja v. Finnish Socialistic Pub. Co., 238 Mass. 345, 130 N.E. 845, 847, quoting with approval the foregoing language of Lord Esher in South Hetton Coal Co., Ltd., v. North-Eastern News Association, Ltd., 1 Q.B. 133, 138, 139, and 141.

▉ A corporation is liable for the acts of its agent, either in contract or tort, done or committed in the course of employment in the business of the corporation. Ætna Life Ins. Co. v. Brewer, 56 App.D.C. 283, 12 F.(2d) 818, 46 A.L.R. 1499; Buckeye Cotton Oil Co. v. Sloan (C.C.A.6) 250 F. 712. And a libel "respecting its business, its ability to do business, its methods of doing business, its credit or solvency, is libelous per se." Maytag Co. v. Meadows Mfg. Co. (C.C.A.7) 45 F.(2d) 299. Security Benefit Association v. Daily News Pub. Co. (C.C.A. 8) 299 F. 445, citing Newell on Slander and Libel, to the same effect. In issuing instructions, suggestions, and information to its subagents, Buchanan was acting within the scope of his employment. The fact that, in executing this work, he may have exceeded or violated his master's instructions cannot aid appellant. This court, speaking through Judge (now Mr. Justice) Vandevanter, has aptly announced this rule: "A master is responsible for the tortious acts of his servants, done in his business and within the scope of their employment, although he did not authorize or know of the particular act, or even if he disapproved or forbade it. * * * Servants do not depart from the scope of their employment * * * merely because, in executing the work assigned to them, they exceed or violate their instructions in respect of its details or the manner of doing it." Western Real Estate Trustees v. Hughes (C.C.A.8) 172 F. 206, 210.

▉ This rule of respondeat superior is forcibly announced by the Supreme Court in Philadelphia & Reading R. R. Co. v. Derby, 14 How. 468, 486, 14 L. Ed. 502. Malice in its legal sense is conclusively implied from a publication libelous per se. Times Pub. Co. v. Carlisle, etc. (C.C.A.8) 94 F. 762; 17 R.C.L. par. 65. In view of the fact that published false statements may constitute libel per se against a corporation as against an individual [National Refining Co. v. Benzo Gas Motor Fuel Co. (C.C.A.8) 20 F.(2d) 763, 55 A.L.R. 406], it follows that by such libel malice may be imputed to the corporation as to an individual. In this legal sense full responsibility must be assumed by the defendant-appellant in this case.

▉ It is earnestly insisted that where an alleged libelous publication recites undisputed facts, and the alleged libelous statement is based upon such facts, the alleged libel cannot be the basis of an action. When the specific libelous statements are considered in connection with the other parts of the letter, and with the publication as a whole, its intendment, and obvious purpose, there can be no doubt that, to ordinary minds, it conveyed the defamatory meaning charged; nor can the writer, nor through him the defendant, be aided by the claim of good faith in making the statement. This court has held that exemplary damages may be allowed when a publication is made with a reckless disregard of the rights of a person, although it was not inspired by ill will, spite, or intent to injure. Times Pub. Co. v. Carlisle (C.C.A.) 94 F. 762. But in this case no exemplary or punitive damages were adjudged. The charge of the court was eminently fair and temperate in tone, and correctly stated the law applicable. As has been said, it met with no challenge from appellant. The verdict of the jury was expressly responsive to the charge, and no claim is made that it was excessive if justified at all.

We have given careful consideration to all points urged by counsel for appellant and conclude that the judgment below should be affirmed. It is so ordered.