THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* RAFAEL RODRÍGUEZ HERNÁNDEZ, Defendant and Appellant.

No. 78. Decided November 30, 1962.

626

*Jorge Luis Landing* and *Ismael Delgado* for appellant. *J. B. Fernández Badillo, Solicitor General,* and *Genoveva R. Carrera, Assistant Solicitor General,* for The People.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos, and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

On January 26, 1960 appellant Rafael Rodríguez Hernández was charged in the Yabucoa Part of the District

Court with the crime of distributing libelous matter in the form of leaflets, defined and punished by § § 243 and 244 of our Penal Code, 1937 edition.[1]

On the following May 9 an amended complaint was filed with leave of the court and notice to the accused, which reads as follows:

"(Title).—I, Ernesto Carrasquillo, resident of Yabucoa, P.R., of legal age, file an amended complaint against the aforesaid defendants for the offense mentioned above, committed in the following manner:

"The aforesaid defendant Rafael Rodríguez Hernández, on December 5, 1959 and in the Municipality of Yabucoa, which is part of the District Court of Puerto Rico, Yabucoa Part, maliciously slandered by means of leaflets or publications, printed or prepared and published in an analogous manner and tending to impeach the probity, honesty, integrity, virtue, good name and reputation of the complainant, the living person Ernesto Carrasquillo, thus exposing him to the public hatred, ridicule and contempt, and the aforesaid defendant Rafael Rodríguez Hernández in same aforesaid city and day, willfully and maliciously, published, distributed, and caused to be distributed said libelous, injurious, and false matter by means of said leaflets which he posted in public places. The text of said leaflets is copied verbatim as follows:

"'WHY WE PROTEST AND DEMAND NEW LEADERSHIP IN OUR UNION.—Colleagues and workers of the Yabucoa Sugar Industry: A new day teeming with glorious expectations is born for you today. Your faith coupled with mutual effort will open the road to you which reaches the zenith of progress and happiness.

---

[1] "Section 243.—Libel Defined. A libel is a malicious defamation, expressed either by writing, printing, or by signs or pictures, or the like, tending to blacken the memory of one who is dead, or to impeach the honesty, integrity, virtue, or reputation, or publish the natural or alleged defects of one who is alive, and thereby to expose him to public hatred, contempt or ridicule.

"Section 244.—Punishment For. (*As amended by Act of March 9, 1911, page 71.*)—Every person who wilfully publishes or procures to be published any libel, or distributes or causes to be distributed any libelous matter in the form of leaflets, cards, or any other manner whatsoever, either printed or written, posting or causing them to be posted in any

" 'Our emancipatory movement continues in full force. It depends on yourselves whether in a near future we may have the satisfaction of saving our Union, by throwing out belly-worshipping leaders, who merely want to stay in power to have the funds of our Union at their disposal and to flout the principles of responsibility.

" 'To win a presidency with votes is an honor, but to seize it through treason is to sell one's dignity and integrity. Thus acted Carrasquillo. He rose to the presidency by means of treachery, fraud, and lies. He acted the same way Judas did when he sold Christ.

" 'How dare you, Carrasquillo, talk of principles when you have spent all your life leeching on us, the workers?

" 'Carrasquillo, you have never known the meaning of respect, dignity or comradeship. That tragic day when you knifed us to grab the presidency is still fresh in the workers' memory.

" 'The chiefling Carrasquillo was not interested in defending your rights. No, he merely wanted to get hold of the Union and of the funds to dispose of your money. For many years the chiefling Carrasquillo has been mocking you. Day after day, minute after minute, he continues to infringe upon your rights. He says he will not give up the presidency because it is the smoothest joy-ride he has had in his life. Of course, since he can dispose of the funds without anybody censuring his actions.

" 'It depends on yourselves, to throw out Carrasquillo, a puppet of the worker's movement. You hold in your hands the sword with which to fight the abuses of power of the chief Carrasquillo, who has never known how to honor the trust which the workers placed in him.

" 'The hour of redemption is here. The light of our hopes shines over the trail that leads to the pinnacle of just and noble demands. Carrasquillo has time to expiate his infamy. It is never too late to pay for one's guilt.

" 'Carrasquillo, we grant you today the opportunity to confess before those very same workers whom you betrayed several years ago when you surrendered us to the employer. Do not

place, is punishable by fine not exceeding five thousand dollars, or imprisonment in jail for a term not exceeding two years, or both such fine and imprisonment, and also the costs of the action, in the discretion of the court."

forget that the workers have already awakened from their lethargy and that they are beginning to see the dawn of a new day, the light that is guiding their way towards new achievements and veritable laurels.

" 'The hour has come to clean the house. You, my dear colleagues, should start with the story-teller of the century, the actor Carrasquillo, so that he may cease enjoying his fiesta. Show this traitor that you already know his dark history, full of infamies, falsehoods, calumnies and treason. TO COMBAT AND TO VICTORY. COMMITTEE FOR THE REFORMATION OF OUR UNION— Fraternally (sgd.) Pedro Cruz Tirado, Angel Rodríguez, Ramón Muñoz Alberio, Francisco Rodríguez Cabrera, Rafael Vergara Dones, Pablo Sénquis, José Manuel Vega, Andrés Vega Rivera, Ignacio Medina Millán, Eleno Alvarez Andino, Juan Medina Ortiz, Juan Fonseca de Jesús, Julián Alvarez Millán, Antonio Muñoz, Valentín Fonseca de Jesús, Venancio Arroyo Martínez, Carmelo Rodríguez Rivera, Isidoro Andújar Ortiz, Juan Cruz Andino, Juan Tirado Alvarez, Francisco Rodríguez Cruz, Zoilo Colón Vázquez, Leoncio Medina de Jesús, Angel Rivera Pagán, Antonio Laboy Burgos, Hermógenes Sánchez Vargas, Rufino Morales, Ignacio Robles García, Carmelo Ramos.—

" 'This communication and all the rest which we shall publish are backed and authorized by more that one thousand workers of Yabucoa. In our next communication we shall relate the history of how Carrasquillo has abused us.'—E. Carrasquillo, complainant."

The trial was held on the 26th of May. The trial court found him guilty and imposed a penalty of ninety days in jail. He appealed to the Humacao Part of the Superior Court, and it affirmed the judgment on March 16, 1961.

Upon defendant's request, on June 16, 1961, we issued a writ to review the proceedings and decide pursuant to law. In his brief he assigns the commission of six errors, namely: (1) the leaflet is not libelous; (2) the same constitutes a privileged communication; (3) it was not proved that he knew about it; (4) the conviction is contrary to the constitutional principle of freedom of speech and thought; (5) the conviction is contrary to the constitutional right of the work-

ers to organize themselves, and (6) defendant was deprived of his right to a trial by jury.

Before proceeding with the study of those points of appeal, we will set forth the factual circumstances shown by the record. The Workers' Union of Yabucoa is a labor organization with headquarters in the town of Yabucoa. Its membership is mainly composed of workers of the sugar industry. In December 1959 there was a labor dispute among its members. One group thereof, named "Committee for Reformation," had filed a petition before the Insular Labor Relations Board in order to hold elections for a new management. It was interested in removing its president, Ernesto Carrasquillo. Stormy sessions had been held which reached the point of personal attacks among rival members. The groups in dispute charged each other with actions incompatible with the welfare and best safeguards of the interests of the unionized workers. The means best preferred for spreading the arguments seems to be that of preparing and distributing leaflets. Ernesto Carrasquillo was the person who "prepared almost all those leaflets" which came from the group defending the leaders of the Union, according to the testimony of its secretary Jesús Santiago Rivera.—S. C., p. 12.

The leaflet entitled "WHY WE PROTEST AND DEMAND NEW LEADERSHIP" of the "Committee for Reformation" which is copied in the complaint, was distributed on December 5, 1959. On the 15th of that month another leaflet was published by the leaders entitled "TRUTH VERSUS LIES"—Defendant's Exhibit 1—which reads as follows:

"Pursuing their campaign of slander and filthiness against the Workers' Union of Yabucoa and its president Ernesto Carrasquillo, the Republican leaders strike again with another anonymous leaflet entitled 'The Octopus and its History.' Since in one of their paragraphs these champions of infamy and vulgarity mention us in such a way that we can not allow such lies to go unanswered, we believe it is our obligation to answer the part which refers to us so that the workers who ignore it may

be able to look down upon those who are trying by all possible means to revert the workers into slavery. Therefore, colleagues, the truth is the following:

"In 1951, a group of unionized workers of the Union presided by Ernesto Carrasquillo, believed that we should join the ILA in order to avail ourselves of the welfare plan that this organization was promising to put into effect. The other part of our Union backed the president, who was of the opinion that the Workers' Union of Yabucoa could establish its own welfare plan without having to join another organization to which we had to pay per capita fees, since this meant a reduced income for our Union. There was no agreement between the groups and since we were advocating joining the ILA we separated, thereby creating the Amalgamated Union of the Factory. Thinking ourselves strong and powerful we asked the National Labor Relations Board if we could hold elections, and as a result of same we were defeated by an overwhelming majority of workers.

"Acknowledging that the victory of the Union presided by Mr. Carrasquillo was absolutely legal, and conscious of the fact that in the elections held there were no irregularities, that is, there was no foul play as the Republicans alleged in their leaflet, we returned to the ranks of the Workers' Union of Yabucoa, except for two or three persons, who yielding to political and hostile issues, held a grudge trying to do the greatest harm possible to the Union and its president. We returned to the Union and here we are, ready to defend it with our life, heart and soul against any scheme of the malefactors who want to destroy it or who try to surrender it to employers with organizations of foremen.

"Who destroyed the Amalgamated Union of the Factory? Can that misinformed story-teller who does not even know the history from its very birth know about it? Nobody destroyed the Union in question. It went out the same way it came in. It died at its birth by the sweeping force of the other party who conquered it with their great victory, calling us all to work united and in the best harmony for the good of all the workers of the Yabucoa sugar industry.

"In Yabucoa, December 15, 1959. Joaquín Cintrón.—Gilberto Cintrón García.—Ambrosio Velázquez."

On January 26, 1960, Ernesto Carrasquillo filed in the Yabucoa Part of the District Court, nine complaints, No. 60-125, against Rafael Rodríguez Hernández, for distributing a leaflet; Nos. 60-126 to 60-133, against Francisco Rodríguez Cabrera, Angel Rivera Pagán, Valentín Fonseca de Jesús, Hermógenes Sánchez Vargas, Carmelo Ramos Figueroa, Rafael Vergara Dones, Juan Tirado Alvarez, and Ignacio Robles García, respectively, as the persons who signed and published the leaflet distributed on December 5. The nine complaints were sworn before the clerk Juan León Carrasquillo.

On May 2, 1960, at the request of complainant Ernesto Carrasquillo, the Secretary of Justice appointed Lic. Víctor Gutiérrez Franqui to act as special prosecuting attorney in those nine cases.

As we stated above, the trial was held on May 26, 1960. Modesto Velázquez Flores, then Prosecuting Attorney for the Superior Court, Humacao Part, was also summoned and appeared as witness for the prosecution. The complainant Carrasquillo did not testify, but in spite of the opposition of defendants, he was present in court during the trial.

The evidence introduced by the special prosecuting attorney consisted in the oral testimony of Jesús Santiago Rivera, the Union's secretary, and in a leaflet sample of the Committee for Reformation included with the amended complaints. That only witness for the prosecution merely testified respecting petitioner herein that on December 5, 1959, Rafael Rodríguez Hernández had given him a leaflet, similar to the one admitted in evidence, when he was in Cristóbal Colón Street, near the town plaza in Yabucoa, and that he saw him distributing it there "to very many persons." Statement of the Case, p. 8.

Although Ernesto Carrasquillo verified before the clerk Juan León Carrasquillo the other complaints filed against only eight of the twenty-nine persons who supposedly signed

the leaflet entitled "WHY WE PROTEST AND DEMAND NEW LEADERSHIP IN OUR UNION," and that in those complaints there appeared as witnesses "Jesús Santiago Rivera, Dionisio Ayala Fernández, Joaquín Cintrón Lebrón, residents of Housing Project Dr. Berríos, in Yabucoa and M. Velázquez Flores (Prosecuting Attorney), Humacao, P. R.," the special prosecuting attorney Gutiérrez Franqui did not introduce any evidence against those eight persons who, as complainant Carrasquillo stated under oath in the complaints Nos. 60-126 to 60-133, published the leaflet of the Committee for Reformation on December 5, 1959, for the purpose of slandering him and impeaching his "probity, honesty, integrity, virtue, good name and reputation."

When the attorney for the defense requested the peremptory acquittal of all nine defendants, the special prosecuting attorney Gutiérrez Franqui stated: "Your Honor, we accept except for the distributor of the leaflet...there is no evidence that they signed that sheet." S.C., p. 29. Immediately thereafter the judge acquitted the eight signing parties and continued the case against the "distributor."

The evidence of the defense consisted of a sample of the leaflet "TRUTH VERSUS LIES" prepared by the management of the Union and of the testimony of Carmelo Ramos, one of the eight aforesaid acquitted and also "Vice-President of the Committee for Reformation." This witness "for the defense" testified that said person was an "organizer" in the Committee for Reformation;[2] that the leaflets dealt with the distribution work of the committee; that as organizer defendant "had the duty to distribute leaflets" to his fellow-workers;

---

[2] Upon being asked since when he was organizer, he answered "Since that date." That phrase, according to the part of his testimony which precedes it, seems to refer to the day in which that committee was established, which seems to be December 20, 1959, or any other date from "the tenth or twelfth" of that month. At any rate, he apparently assumed his role of "organizer" after the distribution of the leaflet on the fifth of that month.

that defendant was neither a member of the Workers' Union of Yabucoa, nor a worker.

The last statement of defendant's attorney was:

"Your Honor, the preliminaries of organizing the meeting which was held, was the leaflets which he distributed. We rest." S. C., p. 45.

We have carefully studied the assignment of errors and in our judgment none of the errors assigned and discussed were committed.

I

In support of his contention that the leaflet distributed by petitioner is not libelous, he alleges that it is of the regular type which "is used in Union disputes and in political strife"; that it is a call to the workers to unite their efforts, that its title shows the reason why it was drafted and the purpose of enumerating the reasons why the workers wish to substitute the present management of the Union; that it has a "spiritualist technique"; that it does not seek to make public charges but "general statements and that when men enter the field of politics or of union disputes they lose part of their privacy and their actions are subject to be criticized and analyzed by their opponents."

A simple reading of the leaflet entitled "WHY WE PROTEST AND DEMAND NEW LEADERSHIP IN OUR UNION," is sufficient to conclude that it is not of a regular type, that it has no "spiritualist technique" and that it does not merely contain general, innocent, and candid statements. Actually, it is a malicious and slanderous piece of writing or printing, the purpose and finality of which, in spite of the demagogical tones and inflammatory style of its language, is none other than to publicly discredit the complainant and present him to the public and to the membership of the Union as a candidate who is degenerate, depraved, and unable to faithfully fulfill his duties as president.

· The leaflet clearly identifies the complainant as the person to which it is addressed. There is no dispute on this particular. Among the terms and phrases employed by same, are found the following:

1. "... by throwing out *belly-worshipping leaders*, who merely want to stay in power *to have the funds of our Union at their disposal and to flout the principles of responsibility.*

2. "To win a presidency with votes is an honor, but to seize it through treason is *to sell one's dignity and integrity.* Thus acted Carrasquillo. He rose to the presidency *by means of treachery, fraud,* and lies. He acted the same way Judas did when *he sold Christ.*

3. "How dare you, Carrasquillo, talk of principles when *you have spent all your life leeching on us, the workers?*

4. "*Carrasquillo, you have never known the meaning of respect, dignity or comradeship.* That tragic day when *you knifed us* to grab the presidency is still fresh in the workers' memory.

5. "The chiefling Carrasquillo was not interested in defending your rights. No, *he merely wanted to get hold of the Union and of the funds to dispose of your money.* For many years the chiefling Carrasquillo has been mocking you. Day after day, minute after minute, he continues to infringe upon your rights. He says he will *not give up the presidency because it is the smoothest joy-ride he has had in his life.* Of course, since *he can dispose of the funds without anybody censuring his actions.*

6. "It depends on yourselves, to throw out *Carrasquillo, a puppet of the worker's movement.* You hold in your hands the sword with which to fight the *abuses of power of the chief Carrasquillo, who has never known how to honor the trust* which the workers placed in him. The hour of redemption is here. The light of our hopes shines over the trail that leads to the pinnacle of just and noble demands. *Carras-*

*quillo* has time to expiate *his infamy*. It is never too late to pay for one's guilt.

7. "Carrasquillo, we grant you today the opportunity to confess before *those very same workers whom you betrayed several years ago when you surrendered us to the employer.* Do not forget that the workers have already awakened from their lethargy and that they are beginning to see the dawn of a new day, the light that is guiding their way towards new achievements and veritable laurels. The hour has come to clean the house. You, my dear colleagues, should start with *the story-teller of the century, the actor Carrasquillo,* so that he may cease enjoying his fiesta. Show this *traitor that you already know his dark history, full of infamies, falsehoods, calumnies and treasons."* (Italics ours.)

■ It is true that those phrases do not technically charge the commission or intention to commit some specific public offense. But considered as a whole and in the general and ordinary concept or meaning in which they are understood here, they constitute a series of serious and slanderous charges which directly tend to attack the honesty, integrity, virtue or good name that the person addressed might enjoy and to expose him, undoubtedly, to public hatred, contempt or ridicule.

■ Section 246 of the Penal Code allows truth as a defense in these cases if it is proved that the charges are true, and that they were published with good motives and for justifiable ends. Defendant neither proved, nor even attempted to prove, that they were true. In such circumstances, its publication is presumed to have been malicious.[3]

■ On different occasions we have come across similar publications.[4] We have always considered the meaning that

---

[3] Section 245 of the Penal Code provides:

"An injurious publication is presumed to have been malicious if no justifiable motive for making it is shown."

[4] *Cf. People* v. *Prensa Insular,* 69 P.R.R. 636 (1949) ; *People* v. *Pargas,* 67 P.R.R. 767 (1947) ; *People* v. *Antonmarchi,* 64 P.R.R. 342 (1945) ;

the phrases or words designated as libelous have in common parlance in Puerto Rico. In the aforesaid case of Pargas, we considered that although the words in question did not charge a public offense respecting one of the cases decided in the opinion, nevertheless, for defendant to say that a certain person betrayed his party "for the stomach," meant that he had forsaken his political ideas in exchange for some sort of a gift "which undoubtedly exposes him to public ridicule."

█ It is true that we have decided that in these cases slanderous or libelous phrases should be interpreted in a liberal sense, taking into account the public interest, and in favor of freedom of speech, and of the right of every citizen to discuss about public officials and issues in general, and that it is one of the nuisances of public life that a public official must thereby be subject to criticism and often to unjust comments; and that unless these trespass the limitation fixed by law they must be tolerated for the sake of maintaining our freedom of speech. —See also, the case of *People* v. *García*, 21 P.R.R. 153.[5] But unhesitatingly we now hold that the publication of the leaflet distributed by petitioner exceeded the limits fixed by law and penetrated the zone forbidden by our Penal Code.

## II

█ In view of the attendant circumstances, the leaflet, even if distributed or "published in the course of a union dispute" was not a privileged communication.

*People* v. *Girona*, 59 P.R.R. 294 (1941); *People* v. *Pacheco Padró*, 58 P.R.R. 739 (1941); *People* v. *Cupril*, 57 P.R.R. 115 (1940); *People* v. *Rodríguez*, 55 P.R.R. 832 (1940); *People* v. *Mirayes*, 52 P.R.R. 307 (1937); *People* v. *Sierra*, 48 P.R.R. 254 (1935); *People* v. *Cardona*, 43 P.R.R. 303 (1932); *People* v. *Gotay*, 43 P.R.R. 440 (1932); *People* v. *Quintana*, 39 P.R.R. 181 (1929); *People* v. *Alamo*, 38 P.R.R. 101 (1928); *People* v. *Forestier*, 36 P.R.R. 790 (1927); *People* v. *Bernard*, 32 P.R.R. 788 (1924); *People* v. *Brau*, 27 P.R.R. 713 (1919); *People* v. *Colberg*, 24 P.R.R. 630 (1916); *People* v. *Villaveitia*, 24 P.R.R. 246 (1916).

[5] In this case appellant was charged with the crime of slander (not of libel as in the present case), consisting in that he had publicly stated in the Market Place of Vieques: "...the mayor of this town of Vieques

■ Section 251 of the Penal Code provides that a privileged communication is one which is made to a person interested in the communication, by one who was also interested or who stood in such relation to the former as to afford a reasonable ground for supposing his motive innocent, and not presumed to be malicious.

■ In libel cases where a privileged communication is involved, the burden of proof shifts, and instead of malice being presumed against the defendant for the use of slanderous words, it must be proved by The People by means of other evidence than the mere libelous document itself. *People v. Polo*, 14 P.R.R. 760, 765 (1908).

The evidence for the defense in this case showed that defendant, on the date in which he distributed the leaflet on the streets of Yabucoa, was not a member of the Workers' Union of Yabucoa, nor of the Committee for Reformation, nor was he even a worker. The truth is, as it appeared from the record, that at least part of those who appeared as signing parties or authors of the leaflet, were members of that Union, although they desired a change of management. But that leaflet with its libelous content was publicly distributed and handed out in the streets of Yabucoa, without it being proved by defendant that the persons to whom they were distributed were members of the Union, or were not strangers to the interests of same. It is true that it is addressed to the "fellow-workers of the Yabucoa Sugar Industry" but this mere circumstance and the existence of a Union dispute do not justify its being used to publicly denigrate, discredit, and

---

is a vagrant (*vago*), is a vagabond (*vagabundo*), he should devote himself to work and to the necessities of the poor..." We decided that those words were not slanderous pursuant to the law applicable to the case.

Section 3 of the Act to Define Rights of the People, approved February 27, 1902—1 L.P.R.A. § 11—provides:

"Freedom of speech shall not be impaired and every person in Puerto Rico shall be free to speak, write or publish whatever he will on any subject, *being responsible however, for all abuse of that liberty.*" (Emphasis added.)

defame any person and to expose him to public hatred, contempt or ridicule. Against this, our Constitution states in § 8 of its Art. II:

"Every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life."

■ The right of freedom of speech or communication to promote in good faith the legitimate interests in these labor disputes entails the obligation to abstain from publishing or communicating falsehoods, lies and slander. It is evident that such disputes, as stated in *Emde v. San Joaquin County Central Labor Council*, 23 Cal.2d 146 (1943), realistically considered, normally involve considerable differences of opinion and vehement adherence to one side or the other, thus a necessarily broad area of discussion without civil responsibility in damages is an indispensable concomitant of these controversies. See *"Libel Actions Arising from Labor Disputes,"* Wis. L. Rev. 537–550 (1953 Vol.); Annotations in 150 A.L.R. 932 and 19 A.L.R.2d 694.

■ It is true that the public is or should be interested in every labor dispute that in some way might affect its welfare, and that it should be kept informed of the course and result of those Union disputes, the effects of which, whether good or bad, might have bearing upon it. But the natural and ordinary existence of that interest on the part of the community, does not make it, for the purposes of § 251 of the Penal Code, the "person interested in the communication," and who receives and to whom the privileged communication is addressed. Those who had a common interest in the matter printed in the leaflet were the members of the Union who were called upon to vote in the workers' elections requested.[6]

---

[6] *Cf.* 53 Corpus Juris Secundum, *Libel* §§ 87 B and C, 91, 92 and 96. *Simon v. Robinson,* 154 A.2d 911; *Della Posta v. Rand Express Freight Lines,* 133 A.2d 775; *Smith v. Surtees,* 143 S.W.2d 90; *Aetna Life Ins. Co. v. Mutual Benefit Health & Acc. Ass'n,* 82 F.2d 115; *Fisher v. Myers,* 100

When that leaflet was publicly distributed among the population of Yabucoa, it ceased to be a privileged communication, presuming, of course, that it originally was so.

By virtue of that publication the communication, which was textually addressed to the "Fellow-workers of the Yabucoa Sugar Industry," left the internal circle of the Union, presenting itself to the public as something definitive and true. See *People* v. *Lastra*, 50 P.R.R. 114 (1936) ; *People* v. *Mirayes, supra; People* v. *Rodríguez, supra.*

## III

■ The evidence of the defense did not prove that defendant ignored the contents of the leaflet. Section 244 punishes, among others, every person who "distributes, or causes to be distributed, any libelous matter in the form of leaflets." The distributor is not required to know the contents of the leaflet.

In *People* v. *Rodríguez*, 38 P.R.R. 597 (1928), we affirmed the judgment sentencing a distributor of a libelous leaflet who could not read or write and who besides, upon discovering the nature of the publication, destroyed the remaining copies.[7]

---

S.W.2d 551; *Draper* v. *Hellman Commercial Trust & Savings Bank*, 263 Pac. 240; 33 Am. Jur., *Libel* §§ 126, 127, 132; NEWELL, Slander & Libel 575, 629, §§ 563, 623.

[7] We stated in that case:

"Any communication of a libel to another person is a publication of the same. 36 C.J. 1223; 37 C.J. 141.

"A man who distributes handbills containing libelous matter presumptively communicates their contents to other persons and is guilty of publishing a libel.

"The appellant maintains that there could be no malice in this case as he did not know how to read or write. Indeed, there was evidence tending to show that as soon as the appellant discovered the nature of the publication he destroyed the copies he had left.

"Malice must be presumed from the publication itself. Otherwise editors, publishers and various other persons could escape responsibility. 16 Cal. Jur. 166; *In re Kowalsky*, 73 Cal. 120; *Commonwealth* v. *Snelling*, 15 Pick. 337. Anyone not knowing the contents of a handbill should apprise himself of its contents before distributing it. When he distributes, although ignorantly, he does a wrongful act intention-

## IV and V

■ Defendant's conviction was neither contrary to the constitutional principle of freedom of speech nor to the constitutional right of the workers to organize themselves.

As we stated in *People* v. *Lastra, supra* at p. 124, "the right to strong, alert, severe, even impassioned criticism cannot be restricted. It belongs to the citizens of a free country. It is theirs and no one may wrest it from them. As to this there is no doubt."

In *People* v. *Pacheco Padró*, 58 P.R.R. 739 (1941), where a newspaperman was charged with the crime of libel, we stated the following:

"Contrary to what appellants maintain, no limitation on the constitutional right of freedom of the press is involved in these cases. The campaign which the magazine Florete carried out during several months shows that as long as proper use was made of this right, nobody was accused. What the Constitution of the United States and the Organic Act of Puerto Rico guarantee is the proper use, and not the abuse of this right. The constitutional rights of private individuals are as sacred as the freedom of the press and the fact that the complainant in this case was a legislator does not deprive him of his right not to be maliciously defamed. Journalists enjoy the privilege granted to them by Section 249 of the Penal Code, but if they overstep said privilege, they cannot seek protection under the broader privilege of freedom of the press. The press can and must be free without resorting to malice, scandal or defamation, and the constitutional guarantee aforementioned does not constitute a defense when libel is committed.

---

ally. Under section 245 of the Penal Code an injurious publication is presumed to have been malicious if no justifiable motive for making it is shown."

The Superior Court, Humacao Part, upon affirming the judgment of the District Court on this particular, stated:

"The court understand that defendant, when distributing the leaflet in question, knew what he was doing. The evidence tends to prove that the defendant, with knowledge thereof, distributed and procured the circulation of said leaflet in the town of Yabucoa." (Judgment Roll at p. 5.)

"In 1904 in the case of *Ex Parte Bird,* 5 P.R.R. (Second edition) 241, 246, this Court, while discussing the freedom of speech and of the press guaranteed by the First Amendment to the Constitution of the United States, expressed itself, through Mr. Justice MacLeary, as follows:

" 'It is confidently believed that no one, under these provisions of the Constitution, even if it should be held to be in force on this Island, could claim that he was thereby licensed to print any and everything which he might choose to publish in regard to persons or officers, or judges or courts in their public or private relations.

" 'In other words, it is the liberty of the press, and not unbounded license, that is intended to be protected by this provision of the Constitution.' "

▆▆ Neither can the workers' right to organize themselves, guaranteed by §§ 17 and 18 of Art. II of our Constitution, constitute a defense when the offense of libel is committed. Our own Constitution is the one which, as we stated above, also provides, in § 8 of Art. II, that "every person has the right to the protection of law against abusive attacks on his honor, reputation and private or family life."

## VI

▆▆ In his sixth assignment petitioner maintains that in libel proceedings defendant has a right to a trial by jury and that he was deprived thereof. He bases his theory on § 246 of our Penal Code, which provides:

"In all criminal prosecutions for libel, the truth may be given in evidence to the court *or jury,* and if it appears to the court or jury that the matter charged as libelous is true, and was published with good motives and for justifiable ends, the party shall be acquitted. *The jury have the right to determine the law and the fact."* (Italics ours.)

In agreement with the last part of that section, our Code of Criminal Procedure states the following in its § 264:

"On a trial for libel, *the jury has the right* to determine the law and the fact." (Italics ours.)

As may be seen, none of those sections have the specific purpose of granting the right to a trial by jury in criminal prosecutions for libel. They merely contain provisions respecting what the jury should do in a particular case and whose duty it is to determine the questions of fact and of law, when the trial for libel is held before a jury, as was the rule, and is still the rule in the State of California, from where the aforesaid § § 246 and 264 are derived. In that state, the Constitution of 1879 guarantees in general, the right to trial by jury in all criminal cases, and establishes its inviolability in Art. I, § 6. In § 9 of the same article, freedom of speech is guaranteed (in a way similar to that of § 3 of our Act of February 27, 1902, which was copied in footnote 5), and the same provisions contained in the aforesaid § § 246 and 264 are specially made respecting trials for libel.

When the jury was established in Puerto Rico by the Act of January 12, 1901, the "district courts" were merely given the power to grant "trial by juries."

When the actual Penal Code and the Code of Criminal Procedure became effective on July 1, 1902, trial by jury was also granted, but to be held exclusively before the district courts, now superior courts. Since jurisdiction to intervene in trials for libel rested in the municipal courts, § § 246 of the Penal Code and 264 of the Code of Criminal Procedure adopted from California, did not apply here, while that was the situation.

For that reason we believe that on March 10, 1904 a law was approved which, by its first section, repealed the aforesaid act entitled "An Act concerning procedure in jury trials" approved in 1901, and providing in § 2 thereof the following:

"Section 2.—The intention of this Act is to leave in full force and effect the Jury Act appearing in the Code of Criminal Procedure of Porto Rico, *except as the same relates to the trial of prisoners for libel.*" (Italics ours.)

The incongruence of granting certain powers to the jury in trials before the municipal courts where there was no jury, was thus eliminated.

However, in subsequent editions of the Penal Code and of the Code of Criminal Procedure up to the present, §§ 246 and 264 appear as effective. If the right to a trial by jury before the existing district court is ever granted, perhaps those sections may apply for the first time to trials for libel. But this would be a legislative question, not a judicial one.

Article II, § 11, of our Constitution merely grants trial by jury "in all prosecutions for a felony." The Judiciary Act of 1952 granted the exclusive power to the district courts (then municipal courts) to intervene only in cases of misdemeanors.

The issue was not raised in the District Court nor in the Superior Court. It is raised here for the first time, and petitioner so states.

We decided this contention adversely in *People* v. *Bird*, 5 P.R.R. 183, 192 (1904), second edition, *Ex Parte Bird*, 5 P.R.R. 241, 260 (1904), second edition, and *People* v. *Rodríguez et al.*, 31 P.R.R. 663, 664 (1923).

In the second of these decisions, *Ex Parte Bird*, after copying the text of § 246 of the Penal Code, we decided:

"Inasmuch as the jury law which has been incorporated into the Code of Criminal Procedure provides that no man has a right to be tried by a jury when charged with a mere *misdemeanor,* and libel is only a *misdemeanor* under the code, the section above quoted cannot by implication give the right to defendant to demand a jury in a libel case. The mere fact that such a recitation is made does not contradict the jury law, since it must be construed to mean that whenever a jury may hereafter be provided for in a libel case they shall have the right to determine the law and the fact. Should the right of trial by jury be extended to defendants in *misdemeanor* cases, or should the offense of libel be raised to a *felony,* then this section could be applied; but until such changes in the laws are made, this recital cannot have the force or effect sought to be given it by

the applicant in this case. Certainly, under no view of the case whatever could a jury have been awarded to defendant on the trial at which he was convicted."

 On the dates when the offense was committed and the trial was held, the juridical situation was similar to that which existed when those cases were decided: the crime ·charged was a misdemeanor, of the jurisdiction of the district court, the last successor in the judicial functions of the :former municipal courts, and the right to be tried by jury only existed in felony cases, the trials of which were held in the superior court. Our judicial system today precludes the application and effectiveness of §§ 246 and 264. As insinuated by petitioner, the problem should have a legislative, not a judicial solution.

Petitioner finally raised in his brief the severity of the penalty of 90 days in jail and prays that if the judgment is affirmed he be imposed as penalty the payment of a fine with the alternative of jail, in default thereof. To that effect he states:

"We also understand that to impose upon a citizen ninety days in jail for distributing a leaflet constitutes a cruel and unusual punishment and is not in adequate proportion with the offense committed, if it is determined that an offense was committed.

"...We must respectfully pray the Supreme Court of Puerto Rico, that after making the necessary findings respecting the contentions of law set forth in this brief, it weigh the circumstances surrounding the facts which gave rise to this complaint, and after analyzing same, if the questions of law raised are not warranted, we pray that in the exercise of its discretion and powers, this Supreme Court order the reduction of the penalty imposed on defendant."

The Solicitor General has made no move either in favor or against this petition.

 We have the authority to modify the judgments of conviction appealed from by the express provision of § 364

of the Code of Criminal Procedure. In numerous appeals, taking into consideration the attendant circumstances in each one, we have exercised that power in the way which has seemed to us most just.

In the case at bar the evidence of The People failed to prove the existence of other facts committed by defendant, aside from the mere distribution of the leaflet, which might be considered as aggravating circumstances in the commission of the offense. We believe that the penalty imposed should be modified, substituting it by a fine of $50, or in default thereof, a day in jail for each dollar left unpaid. The judgment appealed from should be modified in this sense, and as modified, it will be affirmed.